STEPTOE LLP
COREY LAPLANTE (SBN: 294715)
One Market Plaza
Steuart Tower, 10th Floor, Suite 1070
San Francisco, CA 94105
claplante@steptoe.com
(213) 439-9400

STEPTOE LLP
MICHAEL ALLAN (*pro hac vice*)
1330 Connecticut Ave., NW
Washington, DC 20036
mallan@steptoe.com
(202) 429-3000

Attorneys for Plaintiff,
LABELBOX, INC.

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| LABELBOX, INC.,<br><br>    *Plaintiff*,<br><br>    v.<br><br>KSHITIJ GUJARATI, ALBERTO RIZZOLI, V7 CO., and V7 LTD.,<br><br>    *Defendants*. | Case No. 3:25-cv-10159<br><br>**AMENDED COMPLAINT FOR:**<br>**1. TRADE SECRET MISAPPROPRIATION**<br>**2. BREACH OF CONTRACT**<br>**3. TORTIOUS INTERFERENCE WITH A CONTRACT**<br>**4. TORTIOUS INTERFERENCE WITH PROSPECTIVE BUSINESS ADVANTAGE**<br>**5. UNFAIR COMPETITION**<br>**6. BREACH OF DUTY OF LOYALTY**<br>**7. AIDING AND ABETTING BREACH OF DUTY OF LOYALTY**<br>**8. CONVERSION**<br>**9. CIVIL CONSPIRACY**<br><br>**DEMAND FOR JURY TRIAL**<br><br>**INJUNCTIVE RELIEF SOUGHT** |

AMENDED COMPLAINT

Plaintiff Labelbox, Inc. ("Labelbox") alleges against Defendants Kshitij "Gio" Gujarati ("Gujarati"), Alberto Rizzoli, V7 Co. and V7 Ltd. (together "V7") (together with Rizzoli, "V7 Defendants"), (collectively "Defendants") as follows:

**<u>INTRODUCTION</u>**

1.      In early August 2025, Plaintiff Labelbox had no reason to believe that Defendant Gujarati was anything other than a trusted insider—a devoted senior executive dutifully advancing the Company's mission and honoring his contractual and fiduciary obligations. However, unbeknownst to Labelbox, Gujarati's loyalty had shifted. He had by then fully negotiated and accepted an offer to join V7, a direct Labelbox competitor. Instead of disclosing his plans to Labelbox, he actively concealed them—exploiting his ongoing access to Labelbox's systems to download Labelbox's confidential and trade secret information ("Labelbox Information"). Gujarati then proceeded to illicitly convey Labelbox Information to V7 in furtherance of their efforts to win business from Labelbox clients.

2.      Gujarati did not act alone, but rather with the encouragement and direction of V7's CEO, Alberto Rizzoli. Throughout August, while Gujarati remained a Labelbox employee, Rizzoli repeatedly solicited Gujarati's input on how to price bids to win business from Labelbox clients. Gujarati readily complied, reviewing proposed bids and making recommendations based on how he "typically" priced deals at Labelbox, revealing Labelbox's confidential, client-specific pricing and margin data—all while still a Labelbox employee. As Gujarati offered to share more information, Rizzoli did not dissuade him from sharing Labelbox Information. To the contrary, Rizzoli personally directed V7 employees to set up a V7 email address for Gujarati for the express purpose of engaging in further conversations about pricing efforts to win business from Labelbox clients. Gujarati was also given access to V7's Slack account. Additionally, Rizzoli put Gujarati in touch with V7's Head of Sales, who added Gujarati to a call with the client. This all occurred while Gujarati was still working for Labelbox.

3.      Gujarati simultaneously engaged V7 employees in his campaign to conceal his activities from Labelbox. Gujarati requested that V7 allow him to verify his employment without a background check, for the express purpose of avoiding any "competitor concerns" at Labelbox.

AMENDED COMPLAINT

V7 complied. Gujarati also misled Labelbox personnel, claiming that he was transitioning to a different industry altogether—electric vehicle component manufacturing.

4.      Gujarati's deception, designed to avoid raising alarm bells inside Labelbox, worked for a short time. However, after Gujarati made his exit from Labelbox on September 1, 2025, he updated his LinkedIn profile, publicly announcing his new role at V7. Labelbox learned not only that he remained in the data labeling industry, but that he took virtually the exact same role at V7 (General Manager Frontier Data) that he held at Labelbox (Director of Frontier AI). Concerned that Gujarati had concealed his true plans, Labelbox sent both Gujarati and V7 letters asking them to confirm that they had not misappropriated, and would not use, Labelbox's trade secrets. Although Gujarati sent a terse email reply, V7 never responded to, or even acknowledged, Labelbox's good faith outreach.

5.      V7's unwillingness to give even the most basic assurances sparked concern inside Labelbox. Labelbox therefore investigated Gujarati's pre-departure activities. The findings gave rise to significant concern: in the months leading to his departure, Gujarati downloaded a treasure trove of technological and market information that provides a clear roadmap to replicating Labelbox's operations and unlawfully undermining its market position. Much of the information was either wholly outside the scope of Gujarati's employment or had no bearing on his then-current projects with the company, and was downloaded using an unknown, non-Labelbox device.

6.      Gujarati admits that in June 2025, shortly after he began interviewing with V7, he created a folder on his personal Google Drive titled "Labelbox folder." Audit logs from Labelbox's system show that on Saturday, June 7, Gujarati downloaded 31 documents in the span of 50 minutes. The documents related to, *inter alia*, projects for multiple Labelbox clients and prospective clients, roadmaps to Labelbox's internal product management process and systems, confidential product diagrams, and proprietary pay rates. The documents Gujarati downloaded would be essential to enabling a competitor to unfairly compete against Labelbox.

7.      Gujarati admits that, once at V7, he used Labelbox's proprietary information multiple times. Gujarati generated a rate card for V7 using Labelbox's proprietary contractor rates, using a Labelbox rate card Gujarati had placed in his "Labelbox folder". He accessed a compilation

3

AMENDED COMPLAINT

of target hires created by and for Labelbox, and shared specific names of target employees with the V7 recruiting team. He also referenced Labelbox sample task data, which is often client-specific and can be some of the most proprietary technical data available in the data labeling space.

8.    Labelbox developed its trade secrets after spending nearly eight years—and hundreds of millions of dollars—developing software, nurturing customer relationships and obsessively fine-tuning its offering. It protected those trade secrets in part by requiring employees, including Gujarati, to sign confidentiality agreements requiring the protection of Labelbox's information. Those efforts have earned Labelbox a top spot among the leading frontier data providers in the hypercompetitive AI ecosystem. Gujarati's, Rizzoli's and V7's actions now imminently threaten that market position. But Gujarati, Rizzoli and V7 have no right to leverage Labelbox's hard-earned trade secrets for their own success. And Labelbox seeks the Court's assistance in putting an end to their unlawful scheme.

## **BACKGROUND**

9.    Founded in San Francisco in 2018 by Manu Sharma, Dan Rasmuson, and Brian Reiger, Labelbox is a data annotation and management platform that provides high quality data to the world's top artificial intelligence ("AI") laboratories developing machine learning ("ML") technology. AI models must be trained on massive amounts of data, including images, text, video, audio, PDFs, and geospatial data, to understand and generate human-like language, images, and video. That data must first be aggregated, structured, and accurately labeled. Labelbox meets that need by providing customers with exceptional data through innovative software and an elite network of subject matter experts who can annotate data related to complex topics and ideas. Labelbox's customers include Fortune 500 companies, federal agencies, and high-growth technology companies across industries such as agriculture, insurance, transportation, healthcare, retail, real estate, financial services, and manufacturing/robotics. As AI models continue to become more sophisticated, the need for high-quality, specialized training data has increased dramatically.

10.    V7 is an AI data company that competes directly with Labelbox. Specifically, V7 offers comprehensive data-labeling services which, according to its website, include: image labeling services, video annotation services, text labeling and annotation, medical data-labeling

4

AMENDED COMPLAINT

services, and more. V7 has offices in San Francisco, the United Kingdom and, on information and belief, other locations around the globe.

11.     The data-labeling industry is highly competitive, with numerous players, including Labelbox and V7, intensely competing for market share. Data-labeling companies do not only race to develop proprietary annotation technologies, they must also establish and maintain meaningful relationships with a limited number of major AI labs. In this environment, proprietary methods and trade secrets are acutely valuable—especially those that are customer-specific. In one recent, illustrative example, a major AI lab purchased a 49% stake in a data annotation and training platform for $14.8 billion. Another data annotation and training platform recently announced funding at a $10 billion valuation, when it had previously been valued at $2 billion only nine months prior.

12.     Labelbox hired Gujarati as a Senior Product Manager in May 2024 and promoted him to Head of Product and Director of Frontier AI in March 2025. In this new role, Gujarati became one of Labelbox's most senior employees, responsible for overseeing key strategic projects for some of the company's largest clients. This role required that Gujarati have access to Labelbox's most sensitive materials. However, Gujarati's access to Labelbox's confidential, proprietary and trade secret information was conditioned on his agreement to maintain the confidentiality of that information and to refrain from using it after his departure from Labelbox. Gujarati explicitly acknowledged and agreed to these obligations when signing a Proprietary Information and Inventions Agreement ("PIIA") as a condition of his employment.

13.     From the time Gujarati joined Labelbox until his departure on September 1, 2025, Labelbox had no reason to doubt Gujarati's compliance with his confidentiality obligations. However, in early October, Labelbox's senior leaders became very concerned upon learning via LinkedIn that Gujarati had started a position as General Manager Frontier Data with Defendant V7, one of Labelbox's direct competitors (and not an electric vehicle component manufacturer, as he had previously claimed).

14.     Labelbox sent Gujarati a letter on October 16, 2025, reminding him of his contractual obligation to maintain the confidentiality of Labelbox's proprietary and trade secret

AMENDED COMPLAINT

information. Labelbox requested that Gujarati confirm his understanding of his ongoing obligations and compliance therewith in writing by October 27, 2025. Labelbox sent a similar letter to V7, informing them of Gujarati's confidentiality obligations and asking them to confirm, if true, that Gujarati had not revealed any confidential information to V7.

15. Gujarati provided a terse email response. V7 never responded, declining to engage with Labelbox in any way regarding its concerns. Concerned by V7's choice not to respond, and suspecting something untoward, Labelbox conducted an internal investigation of Gujarati's digital activities in the weeks leading up to his departure. Labelbox's Head of IT and Security completed that investigation on November 14, 2025, and immediately shared the results with members of Labelbox's senior leadership team. The investigation revealed a marked and troubling shift in Gujarati's digital activities beginning in June 2025, the month after he first met with Rizzoli, continuing until his departure from Labelbox at the end of August.

16. Company logs show that, throughout the summer, Gujarati accessed, viewed, and downloaded critically important and highly sensitive trade secret information that was unrelated to his responsibilities at the time and/or concerned client accounts with which he was not involved.

17. Those logged activities, in particular the flurry of downloads in the two weeks before his last day, gave Labelbox sufficient cause to retain an outside team of forensic experts. On November 22, 2025, those experts reported the most troubling findings yet: beginning on August 13, 2025, Gujarati was accessing and downloading these materials while logged in via a private, non-Labelbox device—one he had not previously used to access Labelbox's drive.

18. The materials Gujarati accessed and downloaded contain some of Labelbox's most closely guarded trade secrets, including, without limitation, documents outlining Labelbox's core technology including system architecture, software architecture, underlying data from specific projects, key system benchmarking data, training and process flow data, as well as customer lists with confidential revenue information, customer contact information, pricing sheets, assessments of customer projects, customer agreements, pitch decks, target customers, and other strategic business and marketing plans.

AMENDED COMPLAINT

19.    Gujarati was not acting alone when he downloaded Labelbox's confidential and proprietary information. V7's CEO, Alberto Rizzoli, solicited Gujarati's help in winning business for V7 while Gujarati was still employed at Labelbox. Throughout August, while Gujarati was still employed by Labelbox, Rizzoli requested that Gujarati provide him with advice and information about pricing for projects and asked Gujarati to weigh in on V7's response to an RFP for a project for a Labelbox client. He scheduled Gujarati for calls with V7's Head of Sales to discuss the same RFP. Finally, in response to Gujarati providing advice about how to respond to an RFP, Rizzoli responded to thank Gujarati for reviewing the RFP, and said that V7's people operations team "will send you access to a V7 email where we can continue the convo :)". At the time this email was sent, Gujarati was still employed by Labelbox and would be for multiple weeks.

20.    Rizzoli was not the only V7 employee involved in soliciting Gujarati's assistance while he was still employed by Labelbox. V7's Head of Sales added Gujarati to a call with a prospective client about an RFP response in mid-August, and then worked with Gujarati to finalize V7's response to the RFP. V7's Senior People Operations Manager told Gujarati, "[w]e are also going to give you access to your V7 Email address early so we can share information with you securely," and asked him to sign an NDA that would cover the period before his PIIA became effective on his start date with V7.

21.    Gujarati and V7's tortious conduct and theft is especially concerning—and urgent—in light of the highly competitive industry in which both Labelbox and V7 compete. Even a small shift in client relationships can quickly alter market share allocation and thereby have sudden, outsized impacts on a company's business and overall valuation.

22.    By and through their actions, Defendants saw an opportunity to bypass the effort and investment required to develop customer-specific acquisition strategies, optimizations, and retention strategies in a market where success is determined by relationships with a limited pool of customers. This improper use of Labelbox's data and documents violates federal law and Gujarati's contractual confidentiality obligations. Rizzoli and V7 induced Gujarati to violate his contractual obligations and to share Labelbox's confidential and proprietary information with V7.

AMENDED COMPLAINT

Together, the Defendants conspired to use Labelbox's information to enable V7 to improperly compete with Labelbox for clients.

23.    Labelbox therefore brings this action to recover for trade secret misappropriation by both Defendants, for breach of contract by Defendant Gujarati, for tortious interference with contract by the V7 Defendants, tortious interference with prospective business advantage by the V7 Defendants, breach of the duty of loyalty by Defendant Gujarati, aiding and abetting breach of duty of loyalty by V7 Defendants, unfair competition by all Defendants, and civil conspiracy by all Defendants.

## **PARTIES**

24.    Plaintiff Labelbox is a Delaware corporation with its principal place of business at 510 Treat Ave., San Francisco, CA, 94110.

25.    Defendant Gujarati is an adult individual who, upon information and belief, resides in this Judicial District.

26.    Defendant Rizzoli is an adult individual who, upon information and belief, resides in London, England and has publicly represented that he is based in this Judicial District.

27.    Defendant V7 Co. is a Delaware corporation that is registered to do business in California. V7 Co.'s principal address is within this Judicial District, at 201 Spear Street, Suite 1100, San Francisco, CA 94105.

28.    Defendant V7 Ltd. is private limited company headquartered in London, England with its principal place of business in London, England.

29.    Upon information and belief, Defendants V7 Co. and V7 Ltd. are related entities routinely doing business with one another. Moreover, V7 Co. and V7 Ltd. share at least one corporate officer. Alberto Rizzoli is the CEO and Co-Founder of V7 Ltd., and the Chief Executive Officer of V7 Co.

## **JURISDICTION AND VENUE**

30.    The Court has jurisdiction over all the causes of action alleged in this Complaint pursuant to 28 U.S.C. § 1331 because Labelbox asserts claims under the federal Defend Trade

AMENDED COMPLAINT

Secrets Act, 18 U.S.C. §§ 1836, *et seq*. This Court has supplemental jurisdiction over the other claims raised herein pursuant to 28 U.S.C. § 1367.

31.    The Court has personal jurisdiction over Defendants. This Court has personal jurisdiction over V7 Co., including because V7 Co.'s principal place of business is in San Francisco, California, and the fact that V7 Co. regularly and systematically conducts business within this Judicial District. This Court also has personal jurisdiction over V7 Ltd. On information and belief, V7 Ltd. regularly conducts business with V7 Co. within this Judicial District, including by and between sharing the same officer of both entities as CEO. V7 Ltd. has purposefully availed itself within California and this Judicial District through its ongoing business activities, business with related corporate entities within this Judicial District, dealings with Defendant Gujarati within this Judicial District and more.

32.    V7 makes, distributes, offers for sale, sells, or advertises its products and services in the United States, the State of California, and the Northern District of California.

33.    This Court also has personal jurisdiction over Gujarati. On information and belief, Gujarati resides in this District. Gujarati has already consented to the jurisdiction of this Court by and through his agreement with Labelbox.

34.    This Court also has personal jurisdiction over Rizzoli because he purposefully directed tortious and unlawful conduct toward California. Rizzoli intentionally induced a California resident to breach a contract with a California-based company and misappropriated that company's trade secrets, knowing the harm would be suffered in California. By targeting a California business relationship and misappropriating proprietary information belonging to a California company, Rizzoli established sufficient minimum contacts with this forum such that the exercise of jurisdiction comports with due process under the U.S. Constitution and California's long-arm statute (Cal. Code Civ. Proc. § 410.10).

35.    Based on Defendants' conduct, it was wholly foreseeable that they would be bound and subject to a suit in the Northern District of California.

36.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(b) because Labelbox's and V7 Co.'s principal places of business are located in this Judicial District, and

9

AMENDED COMPLAINT

Defendant Gujarati resides in this Judicial District. In addition, a substantial part of the events or omissions giving rise to the claims occurred within this Judicial District. Specifically, Labelbox is headquartered in this Judicial District, and Gujarati worked for Labelbox at its San Francisco office. Gujarati also executed, and subsequently breached, contracts with Labelbox in this Judicial District.

37.    Pursuant to Civil Local Rules 3-5(b) and 3-2(c) and General Order No. 44, because this action is an intellectual property action where a substantial part of the events or omissions giving rise to the claim occurred in San Francisco and Gujarati consented to the jurisdiction of this Division in San Francisco, it is properly assigned to the San Francisco Division.

**FACTUAL ALLEGATIONS**

**A. Background of the Technology**

38.    Data labeling for AI is a rapidly expanding and highly competitive sector driven by the fast adoption of machine learning and data-centric AI models across industries. In order to train accurate and effective AI systems, organizations require large volumes of high-quality annotated data, i.e., data that is meaningfully labeled so that it can structure the information that AI models use to learn. To meet this need, Plaintiff Labelbox works with companies to label and manage large datasets that can be used to train their AI models. Labelbox is one of the leading companies in this ecosystem.

39.    However, the data-labeling sector is rife with competition, and while Labelbox is a leading provider of data-labeling and management services, there are numerous emerging players vying for a share of the market. This competition is characterized not only by the race to develop proprietary annotation technologies, but also by the relationships individual companies have with major AI labs and other large customers. In this environment, even a small shift in client base can have major impact on a company's valuation, and in turn, its future, making proprietary methods and trade secrets especially valuable.

**B. Labelbox's Trade Secrets Are Critical to Its Business and Success**

40.    Labelbox provides companies and organizations across industries with a proprietary platform and related services designed to refine and optimize their AI and ML models.

10

AMENDED COMPLAINT

Through its platform, Labelbox offers a comprehensive suite of tools and capabilities to train AI models, including techniques such as reinforcement learning with human feedback ("RLHF"), reinforcement learning from AI feedback ("RLAIF"), model evaluation, and adversarial testing ("red teaming"). These tools enable customers to fine-tune and align their large language models ("LLMs") to improve model performance, safety, and reliability.

41.    Labelbox has operated in the AI space since its conception in 2018. Labelbox has raised $189 million in funding to date. The Company reinvests its funding and revenue into researching, developing, and refining its proprietary suite of offerings. Through this investment and the efforts of hundreds of employees spanning nearly a decade, Labelbox developed a unique platform that includes proprietary software for processing data and evaluating data scoring metrics, proprietary system architecture and algorithms for aggregating datasets to improve data training models, millions of lines of curated data from AI training projects, and proprietary training manuals and quality control metrics for Labelbox's highly sophisticated network of subject-matter-expert data labelers called Alignerrs. The result of these development efforts is a platform that provides industry-leading data training quality and accuracy, as measured by certain scoring benchmarks which itself are proprietary to Labelbox.

42.    Labelbox has also dedicated substantial time and resources into building customer relationships and tailoring its platform to customers' specific needs. This includes highly sophisticated market research, customer contacts, competitive pricing sheets and rate strategies, pitch sheets, technical test data for winning business from customers in highly competitive bids, and marketing strategies for penetrating new industries and target clients. Labelbox's efforts have resulted in highly lucrative contracts for projects with key customers. The work that Labelbox performs for these clients and the resulting data is also proprietary.

43.    The combination of Labelbox's technology platform and business model have made Labelbox a leader in the AI data training space.

44.    In light of these substantial investments in a highly competitive area of technology, Labelbox maintains significant aspects of its product offerings in strict confidence as trade secrets to protect the core of its business. This confidential and proprietary information derives

11

AMENDED COMPLAINT

considerable value from not being publicly known or readily ascertainable outside of Labelbox. Unauthorized access to Labelbox's trade secret information would enable the recipient to bypass the costly and time-consuming processes of technological research and development, as well as the effort required to establish and cultivate customer relationships and thus obtain an unfair advantage in a rapidly evolving technological space.

**C. Labelbox Guards its Trade Secrets Closely**

45.    Labelbox's proprietary and trade secret information forms the core of its business, and as such, Labelbox takes extensive measures both internally and externally to maintain the integrity of its trade secret information. These measures include, *inter alia*: (1) achieving SOC 2 and ISO 27001 compliance, (2) implementing role-based access to databases containing confidential and trade secret information, with two-factor authentication, (3) contractually obligating all employees to protect proprietary information from public disclosure, (4) physically securing its facilities and ensuring that no unauthorized personnel access its premises, (5) blocking universal serial bus ("USB")/flashdrive access on Labelbox devices, (6) labeling folders and documents with confidentiality warnings, (7) providing written policies codifying employee responsibilities around handling confidential information, (8) implementing the use of non-disclosure agreements with customers and third-parties before disclosing any confidential information, and (9) fostering a culture of confidentiality among its employees to ensure that its employees are aware of their responsibilities to protect such information.

**D. Defendant Gujarati's Work for Labelbox**

46.    Kshitij "Gio" Gujarati began working for Labelbox in June 2024 as Senior Product Manager, and was promoted in March 2025 to Director of Frontier AI and Head of Product. Gujarati was responsible for overseeing Labelbox's industry-leading AI data-labeling operations and managing some of Labelbox's largest client accounts.

47.    In this role, Gujarati ranked among the most senior employees at Labelbox and had role-based access to confidential, proprietary and trade secret information on Labelbox's technological offerings and its individual customer relationships and datasets.

AMENDED COMPLAINT

48.     Gujarati's employment at Labelbox and his access to Labelbox's confidential materials and trade secrets was conditioned on Gujarati's agreement to maintain the confidentiality of Labelbox's confidential, proprietary and trade secret information, and to refrain from using that information after his departure from Labelbox. These terms were memorialized in the May 29, 2024 PIIA between Gujarati and Labelbox that Gujarati signed as a condition of his employment. Gujarati's acceptance of the terms of the PIIA was critical to Labelbox's decision to employ Gujarati and give him access to Labelbox's proprietary, confidential and trade secret information. Furthermore, Defendant Gujarati was given the standard employee trainings on data confidentiality and attested to his understanding of these requirements.

49.     The PIIA requires that, upon termination of employment, Gujarati "will promptly return to Company all items containing or embodying Proprietary Information (including all copies), except that I may keep my personal copies of (i) my compensation records, (ii) materials distributed to shareholders generally and (iii) this Agreement." PIIA ¶ 4.

50.     Gujarati's employment was also conditioned on his refraining from working in a role that created a conflict of interest for Labelbox while he was a Labelbox employee. The opening paragraph of his Employment Agreement states: "While you render services to the Company, you will not engage in any other employment, consulting or other business activity (whether full-time or part-time) that would create a conflict of interest with the Company."

51.     Similarly, the PIIA required Gujarati to agree that "during the term of my employment with Company (whether or not during business hours), I will not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of Company, and I will not assist any other person or organization in competing or in preparing to compete with any business or demonstrably anticipated business of Company." PIIA ¶ 6.

52.     Gujarati gave notice of his resignation on August 15, 2025. Before his departure, Gujarati informed Labelbox that he did not intend to join a competitor and was leaving the company to work as a consultant in the electric vehicle industry. Gujarati left his employment with Labelbox on September 1, 2025. However, in early October, Gujarati updated his LinkedIn profile,

AMENDED COMPLAINT

disclosing that he had started a position as the General Manager Frontier Data at V7, Labelbox's direct competitor.

### E.  Gujarati's and V7's Misappropriation of Labelbox's Trade Secrets

53.     In May 2025, unbeknownst to Labelbox, Gujarati began interviewing for a position with V7. On May 2, Gujarati met with Rizzoli to discuss a role working on V7's data-labeling offering, Darwin. Emails show that by mid-June, Gujarati had met with V7's Co-founder and CTO, Simon Edwardsson, and V7's Head of Operations, Anastasia Kaschenko. Gujarati was regularly corresponding with Rizzoli, asking detailed questions about V7's plan for Darwin, what responsibilities he would have in executing that plan, and discussing V7's strategic growth plans.

54.     In June, Gujarati created a folder on his personal Google Drive titled "Labelbox folder," to which he began saving Labelbox documents. Labelbox's Google Drive audit logs show that on Saturday, June 7, Gujarati engaged in a flurry of abnormal downloading activity, downloading thirty-one documents in less than an hour. The stolen materials spanned multiple clients and a wide range of topics, including internal process related and technical documents, making the downloads even more suspicious.

55.     Gujarati's illicit download activity did not stop there. As his hiring process with V7 continued, so did his downloading activity, peaking in August after he had signed his employment agreement with V7. Much of Gujarati's August downloading activity directly corresponded to requests from Rizzoli asking for assistance with RFP submissions.

56.     For example, on August 4, 2025, nearly a full month before Gujarati left Labelbox, Rizzoli wrote to Gujarati: "Hi Gio! I'm working on an SOW for the project we spoke about on Friday. Do you have 5 min to sync today? Would like to get your opinion *on pricing*" (emphasis added). The project at issue was for a Labelbox client. Mr. Gujarati responded by detailing how he "typically" prices such deals and even revealed the specific margins Labelbox applies on top of contractor rates. He went on to reference pricing from another key Labelbox client and then "deriving from that," he recommended specific dollar amounts for Rizzoli to use in the proposal. Rizzoli responded, "Many thanks! Will have a read and discuss with the team."

AMENDED COMPLAINT

57. On August 13, 2025, Mr. Rizzoli again encouraged Gujarati to assist in the pursuit of a Labelbox client ("When you have a sec, I'd love your thoughts on this RFP.") Gujarati responded on August 14, 2025, by, among other things, saying that he would send "global tiered rates that [V7] can use for reference," adding "we need to price aggressively". Gujarati also asked: "What else can I provide that would be most helpful for the RFP?" The following day, August 15, 2025, Rizzoli expresses gratitude and says "Joe (form [sic] our people team) will send you access to a V7 email where we can continue the convo :)". Joe Stephenson, V7's Senior People Operations Manager, then emailed Gujarati, "[w]e are also going to give you access to your V7 Email address early so we can share information with you securely." As a requirement of obtaining his V7 email address early, Stephenson asked Gujarati to sign an NDA that would cover the period before his PIIA became effective on his start date with V7.

58. Gujarati and Stephenson worked together to conceal Gujarati's activities from Labelbox. Gujarati wrote via WhatsApp on August 13, 2025, "Is there a different way [other than a background check] to verify my [L]abelbox employment… For now all they need to know is I'm leaving. I want to avoid any competitor concerns until my actual last day." Stephenson responded, "that's no problem… A copy of a paycheck is fine for that," enabling Gujarati to hide his activities with V7 from Labelbox.

59. Gujarati also met with and shared information with V7 investors and various other V7 executives including V7's Co-Founder, Head of Operations, Head of Sales and Senior Engineers. These meetings occurred in person, over the phone, over email, and via WhatsApp and Slack.

60. In all, from the time he began interviewing with V7 to the time he left Labelbox, Gujarati downloaded dozens of critical and confidential documents from Labelbox's databases. These include, without limitation, documents outlining Labelbox's core technology including system architecture, software architecture, underlying data from specific projects, key system benchmarking data, training and process flow data, as well as customer lists with confidential revenue information, customer contact information, pricing sheets, assessments of customer projects, customer agreements, pitch decks, target customers, and other strategic business and

AMENDED COMPLAINT

marketing plans. Gujarati accessed and downloaded these documents on personal devices, including a non-Labelbox Apple laptop that he had not used to access the Labelbox system at any other time during his employment.

61.    The downloaded documents were either generally outside the scope of Gujarati's work at Labelbox, or had no bearing on his then-current projects with the company.

62.    Many of the documents Gujarati downloaded originate from a secure folder subject to strict role-based access controls, accessible only to senior employees. This folder is expressly marked "Confidential." Other documents are expressly marked as "Confidential." The stolen materials include (1) technical engineering documents including software architecture diagrams for Labelbox's security and data processing infrastructure, system architecture diagrams for evaluating AI model performance including the unique compilation of datasets, algorithms, and process flows that are used, spreadsheets containing thousands of lines of curated data revealing key scoring metrics, presentations outlining scoring metrics used to achieve data-labeling accuracy, and data quality benchmarking scores; (2) internal process and training documents including training manuals for data labelers, quality assurance dashboard documents, and pricing sheets for data labelers; (3) customer-related documents including Labelbox's master spreadsheet of customers with financial performance, project strategy and risk, customer retention, and customer contact information, the Master Services Agreement and Statements of Work for a key Labelbox customer revealing key pricing and rate structures for services, and presentations, project strategy, and data outputs from customer projects; and (4) customer acquisition documents including strategies for generating new business with target customers and industries, pitch decks with strategies for prospective customers that Labelbox is actively pursuing, and prospective customer contact information.

63.    These are only a small sample of documents Gujarati downloaded and does not include other trade secret information Gujarati had access to during his employment. Each of these documents is among Labelbox's most valuable trade secret assets. In the wrong hands, this information could provide a significant competitive advantage and do irreparable damage to Labelbox. Gujarati had no business reasons for downloading these documents. Gujarati was not

16

AMENDED COMPLAINT

affiliated with the specific projects these documents related to and, given the timing of the download (just weeks before his departure), Gujarati's intent to use them at V7 for V7's benefit is clear.

**F.    Gujarati's Theft of Labelbox's Documents Gives V7 an Unlawful Advantage**

64.    Like Labelbox, V7 is a technology company that provides AI-powered tools for data annotation, labeling, and model training. V7 has been attempting to compete with Labelbox's established and well-regarded products and services in the development of data centric AI training models. However, on information and belief, recognizing that the market was highly competitive and rapidly evolving, V7 needed Labelbox's trade secrets to surpass Labelbox in the market. Gujarati joined V7 immediately after his departure from Labelbox.

65.    At all relevant times, V7 and Rizzoli knew that Gujarati was employed by Labelbox and knew of the nature of his work and responsibilities while employed by Labelbox. V7 and Rizzoli knew, including by and through Gujarati and through Rizzoli's receipt of Labelbox documents and information, that Gujarati had accessed and downloaded a wide variety of highly sensitive and valuable confidential information and trade secrets to one or more of his personal computers leading up to his last day of employment with Labelbox. Upon information and belief, V7 and Rizzoli acquired, used and disclosed Labelbox's confidential information and trade secrets to compete with Labelbox and others in the AI data space.

66.    At all relevant times, V7 and Rizzoli knew that, as an employee of Labelbox, Gujarati owed a duty of loyalty to Labelbox that prevented him from working for a competitor while employed with Labelbox. V7 and Rizzoli solicited information and advice from Gujarati, the provision of which necessarily required Gujarati to violate his duty of loyalty to Labelbox, and helped him conceal his illicit conduct from Labelbox.

67.    At all relevant times, V7 and Rizzoli knew that, as an employee of Labelbox, Gujarati had an employment agreement with Labelbox that prevented him from working for a competitor while employed with Labelbox. V7 and Rizzoli solicited information and advice from Gujarati, inducing Gujarati to violate his contractual obligations to Labelbox. V7 and Rizzoli then helped him conceal his illicit conduct from Labelbox.

17

AMENDED COMPLAINT

68.    At all relevant times, V7 and Rizzoli knew that, as an employee of Labelbox, Gujarati had a Proprietary Information and Inventions Agreement with Labelbox (which are standard in the industry as evidenced by V7 requiring Gujarati to sign a PIIA themselves) that prevented him from revealing Labelbox's confidential and trade secret information. V7 and Rizzoli solicited Labelbox's confidential and trade secret information from Gujarati, inducing Gujarati to violate his contractual obligations to Labelbox. V7 and Rizzoli then helped Gujarati conceal this illicit conduct from Labelbox.

69.    Through Gujarati, V7 now has Labelbox's trade secret information including, without limitation, information regarding Labelbox's core technology including system architecture, software architecture, underlying data from specific projects, key system benchmarking data, training and process flow data, as well as customer lists with confidential revenue information, customer contact information, pricing sheets, assessments of customer projects, customer agreements, pitch decks, target customers, and other strategic business and marketing plans.

70.    Upon learning that Gujarati was now working with its direct competitor, V7, Labelbox sent a letter to both Gujarati and V7 on October 16, 2025. In its letter to Gujarati, Labelbox reminded him of his duty "not to violate the law and/or any of [his] ongoing obligations to the Company, including those enumerated in [his] Proprietary Information and Inventions Agreement." The letter further requested that Gujarati:

> provide written confirmation, by no later than October 27, 2025, that you:
> (1) Have reviewed your Proprietary Information and Inventions Agreement dated May 29, 2024;
> (2) Understand and acknowledge your ongoing obligations under that agreement, including those relating to the protection of the Company's Proprietary Information and trade secrets; and
> (3) Have not used, disclosed, or retained any Company Proprietary Information or trade secrets for the benefit of yourself or any third party, and will not do so in the future.

71.    Labelbox sent a similar letter to V7 to provide "notice of Mr. Gujarati's obligations under his agreements with Labelbox." The letter emphasized that the Gujarati's obligations

18

AMENDED COMPLAINT

continue "*even after the end of his work for Labelbox.*". As with Gujarati's letter, the letter to V7 requested that the company:

> confirm the following in writing, if true, by no later than October 27, 2025:
> (1) that Mr. Gujarati has not disclosed, not used for the benefit of, and/or not used during his employment with V7 any of Labelbox's information, including confidential, proprietary, or trade secret information, whether written or verbal.
> (2) that V7 has not and will not interfere with Mr. Gujarati's obligations to Labelbox as set forth in his Confidentiality Agreement.

72.    Gujarati acknowledged the email and confirmed that he would not violate the terms of the agreement. He made this representation even after spending months downloading Labelbox's confidential and proprietary information and sharing that information with Rizzoli and V7.

73.    V7 failed to provide the routine and straightforward confirmations that Labelbox requested. V7's failure to respond shows its disregard for Gujarati's contractual obligations and intent to improperly use Labelbox's proprietary and confidential information. Documents produced to date demonstrate that V7 and Rizzoli improperly received and used confidential, trade secret, and/or proprietary information taken by Gujarati from Labelbox to unfairly advance its business in the highly competitive space in which these companies operate, for the purpose of diverting customers from Labelbox.

## COUNT I
### Trade Secret Misappropriation Under
### The Defend Trade Secrets Act, 18 U.S.C. §§ 1836 *et seq.*, 1839 *et seq.*
### (Against All Defendants)

74.    Labelbox re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

75.    Labelbox is the owner of certain valuable trade secrets in and relating to its AI training models as described above. These confidential and proprietary trade secrets are of substantial economic value and their possession provides competitive advantages in the field of AI training, and Labelbox has spent significant time and money developing them. These trade secrets and confidential information, as described above, constitute "trade secrets" within the

19

AMENDED COMPLAINT

meaning of 18 U.S.C. § 1839(3). Labelbox's confidential and trade secret information derives independent economic value from not being generally known or readily ascertainable. Labelbox's confidential and trade secret information relates to products or services used, sold, or purchased, or intended for use, sale, or purchase, across the United States and throughout the world.

76.    Labelbox has taken reasonable measures to maintain the secrecy of its confidential, proprietary and trade secret information, including those trade secrets misappropriated by the Defendants as described herein. Defendant Gujarati received access to Labelbox's trade secret information as a result of his acceptance of the obligations and terms of the Proprietary Information and Inventions Agreement. The terms of Gujarati's PIIA obliged him to maintain the confidentiality of Labelbox's proprietary information, including but not limited to Labelbox's trade secret information.

77.    Having acquired Labelbox's trade secrets under circumstances giving rise to a duty to maintain the secrecy of Labelbox's trade secrets, Gujarati unlawfully misappropriated Labelbox's trade secrets by disclosing or using Labelbox's trade secrets without Labelbox's consent.

78.    Defendants acquired, accessed, disclosed and used Labelbox's trade secret and confidential information by improper means, without Labelbox's express or implied consent, and in violation of the Proprietary Information and Inventions Agreement discussed herein. Defendants acquired Labelbox's trade secrets through improper means in order to benefit themselves, and to allow V7 to unfairly compete against and harm Labelbox.

79.    Defendants knew or had reason to know at the time they acquired, disclosed and used Labelbox's trade secret and confidential information that the trade secrets and the material containing the trade secrets was confidential and propriety to Labelbox and was acquired and maintained by improper means and/or under circumstances creating a duty to maintain confidentiality or limit use including by and through the Proprietary Information and Inventions Agreement. Defendants further knew and understood that the information contained in the Labelbox trade secrets was information that was not generally known or available in the public

domain, and was information that would provide a significant and unfair competitive advantage to those in competition with Labelbox.

80.     V7 and Labelbox are competitors in the AI data space. V7 is looking to expand its business footprint in the field of AI data labeling. V7 and Rizzoli hired Gujarati to perform the same duties at V7 that he had at Labelbox. On information and belief, V7 and Rizzoli knew or had reason to know, and expected, that Gujarati would have acquired Labelbox's confidential and trade secret information prior to his departure from Labelbox so that such information could be disclosed to and used by V7 and Rizzoli to unfairly compete with Labelbox.

81.     Gujarati is an agent of V7 and his misappropriation, use and disclosure of Labelbox's confidential trade secret information occurred and is occurring during the course of his employment with V7 and was and continues to be, in part, for the benefit of V7 in order to give V7 an unfair advantage in competing against Labelbox. V7 is at least vicariously liable for Gujarati's misappropriation, use and disclosure of Labelbox's trade secrets, in addition to being directly liable for its own improper acquisition, use and disclosure of Labelbox's trade secrets as set forth herein.

82.     Labelbox has never, directly or indirectly, consented to the Defendants' use, acquisition or disclosure of its trade secrets.

83.     Defendants have engaged in the actual or threatened misappropriation of Labelbox's confidential and trade secret information in violation of the DTSA.

84.     Defendants' actions, as alleged herein, constitute "misappropriation" within the meaning of 18 U.S.C. § 1839(5).

85.     Defendants' misappropriation has proximately damaged Labelbox, including without limitation, in the form of loss of profits, goodwill, business opportunities and competitive advantage in the hyper-competitive and fast-moving industry in which Labelbox and V7 directly compete. As a result, Labelbox seeks damages.

86.     Defendants have further been unjustly enriched as a proximate result of their misappropriation of Labelbox's confidential information and trade secrets. As a result, Labelbox seeks damages.

AMENDED COMPLAINT

87.     The actions of Defendants, as alleged herein, were willful, malicious and done with intent to injure Labelbox and unfairly advantage V7, thus warranting a punitive damage award pursuant to 18 U.S.C. § 1836(b)(3)(C) and attorneys' fees under 18 U.S.C. § 1836(b)(3)(D).

88.     The actions of Defendants, as alleged herein, also entitle Labelbox to preliminary and permanent injunctive relief including by enjoining Defendants from using or retaining Labelbox's confidential and trade secret information, enjoining the destruction, altering or deletion of any trade secret information or material or information derived from Labelbox's trade secret information, and requiring a turnover of all material concerning, referring, related to or embodying in whole or in part any of Labelbox's confidential and trade secret information.

## COUNT II
### Breach of Contract
### (Against Gujarati)

89.     Labelbox re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

90.     Gujarati voluntarily entered the Proprietary Information and Inventions Agreement with Labelbox.

91.     The Proprietary Information and Inventions Agreement is valid, binding, and enforceable.

92.     The Proprietary Information and Inventions Agreement is supported by adequate legal consideration.

93.     Labelbox performed as required under the Proprietary Information and Inventions Agreement.

94.     Under the terms of the Proprietary Information and Inventions Agreement, Gujarati agreed that he "will hold in confidence and not disclose or, except within the scope of my employment, use any Proprietary Information."

95.     Under the terms of the Proprietary Information and Inventions Agreement, Gujarati further agreed that he "will promptly return to Company all items containing or embodying Proprietary Information (including all copies)."

22
AMENDED COMPLAINT

96. Under the terms of the Proprietary Information and Inventions Agreement, Gujarati further agreed that he "during the term of my employment with Company (whether or not during business hours)…not engage in any activity that is in any way competitive with the business or demonstrably anticipated business of the Company, and I will not assist any other person or organization in competing or in preparing to compete with any business or demonstrably anticipated business of Company."

97. The Proprietary Information and Inventions Agreement obligated Gujarati to continue to comply with certain obligations, including the duty to maintain confidential information, after his departure from Labelbox.

98. Gujarati materially breached the Proprietary Information and Inventions Agreement including by downloading and keeping in his possession confidential materials belonging to Labelbox.

99. Gujarati materially breached the Proprietary Information and Inventions Agreements including by accessing and downloading confidential materials belonging to Labelbox, during his employment to Labelbox, in order to compete and prepare to compete with Labelbox and to assist V7 in competing and preparing to compete with Labelbox.

100. As a result of Gujarati's conduct, Labelbox has suffered and continues to suffer substantial harm.

101. As a result of Gujarati's conduct, Labelbox has suffered, continues to suffer, and will suffer damages in an amount to be determined at trial.

## COUNT III
### Tortious Interference with a Contract
### (Against V7 and Rizzoli)

102. Labelbox re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

103. V7 and Rizzoli tortiously interfered with Labelbox's contractual relations and business expectations.

104. The Proprietary Information and Inventions Agreement between Labelbox and Gujarati is valid, binding, and enforceable.

23

105.    V7 and Rizzoli knew of, or should have known of the Proprietary Information and Inventions Agreement and the obligations and terms thereof, including the provisions directed to non-disclosure of Labelbox's confidential, proprietary and trade secret information.

106.    Upon information and belief, V7 and Rizzoli induced, encouraged, and/or allowed Gujarati to breach the Proprietary Information and Inventions Agreement as provided in Count II and to misappropriate Labelbox's confidential, proprietary and trade secret information so that V7 and Rizzoli could use this information to benefit its business.

107.    Upon information and belief, V7 and Rizzoli improperly leveraged the confidential, proprietary and trade secret information it received from Gujarati to advance its business prospects in an effort to directly compete with Labelbox.

108.    V7's and Rizzoli's actions under this Count were taken knowingly and without justification or privilege.

109.    Labelbox has no adequate remedy at law to redress the damage that has been and is being done by V7's and Rizzoli's tortious interference with the Proprietary Information and Inventions Agreement between Labelbox and Gujarati and V7's and Rizzoli's attempt to advance its own business prospects in the data labeling field with use of Labelbox's confidential and proprietary information.

110.    As a direct result of V7's actions and unless V7 and Gujarati are enjoined from using and/or disclosing Labelbox's confidential, proprietary and trade secret information, Labelbox has suffered and will suffer substantial and irreparable harm and damages, including the loss of its proprietary information and damage to its business position.

## COUNT IV
### Tortious Interference with Prospective Business Advantage
### (Against V7 and Rizzoli)

111.    Labelbox re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

112.    Labelbox has and at all material times had a reasonable expectation of prospective advantageous business relationships with a key Labelbox client (henceforth, "Key Client"), specifically with regards to a data infrastructure project using Labelbox's proprietary technology.

24

AMENDED COMPLAINT

This prospective relationship has been interfered with by Defendants' conduct, as alleged above, in using Labelbox's confidential, proprietary and trade secret information specific to Key Client.

113.    At all relevant times, V7 and Rizzoli knew of Labelbox's prospectively advantageous relationship with Key Client based on information Defendant Gujarati learned during his employment at Labelbox.

114.    V7 and Rizzoli intentionally interfered with this prospective business relationship by, among other things, misappropriating Labelbox's customer, pricing and system information related to Key Client in order to present proposals to Key Client for V7's own products and services, thereby attempting to undercut Labelbox's relationship with Key Client.

115.    On information and belief, as a result of V7's and Rizzoli's actions, V7 and Rizzoli caused actual interference with Labelbox's prospectively advantageous relationship with Key Client by diverting Key Client's business away from Labelbox and to V7.

116.    V7's and Rizzoli's acts were willful, malicious, and undertaken with the intent to cause harm to Labelbox and to undercut Labelbox's business.

117.    As a result of V7's and Rizzoli's actions, on information and belief, V7 and Rizzoli caused actual interference with Labelbox's prospective business relationship with Key Client and caused Labelbox to be damaged economically in an amount to be determined at the time of trial.

## COUNT V
**Unfair Competition (California Business & Professions Code § 17200, *et seq.*)**
**(Against V7 and Rizzoli)**

118.    Labelbox re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

119.    V7's and Rizzoli's conduct described throughout the Complaint, including its active role in facilitating the misappropriation of Labelbox's confidential, proprietary and trade secret information through Gujarati in violation of his Proprietary Information and Inventions Agreements to procure trade secret information about Labelbox's business and key clients, constitutes unfair competition in violation of California Business and Professions Code Section 17200, *et seq.*

AMENDED COMPLAINT

120.    As a result of Defendants' unfair competition, Labelbox has suffered and will continue to suffer irreparable harm, including, without limitation, harm to its business reputation, goodwill, and statute, for which there is no adequate remedy at law, thereby justifying injunctive relief.

121.    Until and unless injunctive relief is granted, Labelbox will be irreparably harmed and Defendants will be unjustly enriched, and this enrichment should be disgorged pursuant to allowable remedies under California Business and Professions Code Section 17200, *et seq*.

<u>COUNT VI</u>
**Breach of Duty of Loyalty**
**(Against Gujarati)**

122.    Labelbox re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

123.    As an employee of Labelbox, Gujarati owed Labelbox a duty of loyalty, including a duty to act for Labelbox's benefit, to protect Labelbox's interests, to preserve its relationships with its clients, and to subordinate his personal interests to those of Labelbox.

124.    California Labor Code Section 2860 provides that everything an employee acquires by virtue of his or her employment belongs to the employer, whether acquired during or after the expiration of the term of his or her employment.

125.    California Labor Code Section 2863 provides that an employee who has any business to transact on his own account that is similar to that entrusted to the employee by his employer must give preference to the business of the employer.

126.    By virtue of Gujarati's acts described above, including, among other things, misappropriating Labelbox's confidential, proprietary and trade secret information, and providing this information to V7 and Rizzoli, Labelbox's direct competitor, Gujarati has breached the duties of loyalty owed to Labelbox.

127.    As a foreseeable, direct and proximate result of Gujarati's breach of his duty of loyalty, Labelbox has been harmed and is entitled to damages including disgorgement by Gujarati of the salary, benefits, and other forms of remuneration paid to him during the time that he was

disloyal to Labelbox, and all profits that Gujarati and V7 received as a result of this disloyalty, in an amount to be determined at trial.

128. Gujarati's actions were done with malice, fraud, oppression, and reckless disregard of Labelbox's rights entitling Labelbox to recover punitive damages in an amount appropriate to punish Gujarati.

## COUNT VII
### Aiding and Abetting Breach of Duty of Loyalty
### (Against V7 and Rizzoli)

129. Labelbox re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

130. V7 and Rizzoli provided substantial assistance, support, and encouragement to Gujarati in committing the breach of his duty of loyalty described above, including by soliciting information from Gujarati related to existing Labelbox clients. V7 and Rizzoli engaged in this conduct with full knowledge that Gujarati was still employed by Labelbox and therefore, owed Labelbox a duty of loyalty.

131. V7 and Rizzoli accepted the benefits of Gujarati's misconduct with full knowledge that Gujarati's acts were wrongful.

132. V7 and Rizzoli's conduct was a substantial factor in causing the harm suffered by Labelbox.

133. As a direct and proximate cause of V7 and Rizzoli's unlawful conduct, Labelbox has suffered economic damages, including, without limitation, damage to business reputation, lost profits, lost revenue, loss of its competitive position, loss of market share, and lost business opportunities, all in an amount to be determined at trial.

134. V7 and Rizzoli's actions were done with malice, fraud, oppression, and reckless disregard of Labelbox's rights described above and within the meaning of California Civil Code Section 3294. Labelbox is thus entitled to recover punitive damages.

27
AMENDED COMPLAINT

## COUNT VIII
### Conversion
### (Against All Defendants)

135. Labelbox re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

136. Labelbox owned and had the right to own and possess its confidential, proprietary and trade secret information.

137. Defendants intentionally and substantially interfered with Labelbox's confidential, proprietary and trade secret information by misappropriating it and using it for their own benefit, including by using Labelbox's confidential, proprietary and trade secret information to target Labelbox's clients and divert business away from Labelbox.

138. Labelbox did not consent to Defendants' misappropriation of its confidential, proprietary and trade secret information.

139. Defendants worked in coordination to acquire Labelbox's confidential, proprietary and trade secret information improperly in violation of Gujarati's Proprietary Information and Inventions Agreement with Labelbox.

140. Labelbox was harmed by Defendants' conduct.

141. Defendants' conduct was a substantial factor in causing Labelbox's harm.

142. Labelbox is entitled to damages in an amount greater than $75,000, the actual amount to be proven at trial.

## COUNT IX
### Civil Conspiracy
### (Against All Defendants)

143. Labelbox re-alleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

144. Defendants formed and operated a conspiracy for the purpose of misappropriating Labelbox's confidential, proprietary and trade secret information, and used this information to tortiously interfere with Labelbox's existing and prospective client relationships, as well as to unfairly compete against Labelbox and to convert Labelbox's property.

28

AMENDED COMPLAINT

145. The foregoing conduct of the Defendants' was malicious, was performed with intent to injure Labelbox, and was without justification or privilege. Defendants' conduct was undertaken in furtherance of their own personal interest and for the benefit of V7.

146. Each Defendant engaged in overt unlawful acts and conduct in violation of Labelbox's contractual, common law and statutory rights as described above, and did so with the knowledge, aid, agreement and support of the other Defendants, causing actual harm to Labelbox.

147. By virtue of the formation and operation of this conspiracy by Defendants, and as a consequence of the above-described wrongful acts and conduct and the harm and injury caused to Labelbox thereby, each Defendant as a participant in this conspiracy is liable as a joint tortfeasor for each and every one of the above-described acts committed by each Defendant/co-conspirator.

148. Labelbox has been damaged by Defendants' actions in an amount to be determined at trial.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff prays for as follows:

1. For judgment in Labelbox's favor and against the Defendants on all causes of action alleged herein against them;

2. Award Labelbox damages in an amount to be determined at trial, including without limitation, Labelbox's lost revenues and profits, and any unjust enrichment, restitution, or disgorgement, breach of contract damages, plus a reasonable royalty to the extent permitted under the law;

3. Award a preliminary and permanent injunction against Defendants, requiring Defendants to return all stolen information and documents (and all material derivative from such information) to Plaintiffs and enjoining Defendants from further misappropriating or using Labelbox's trade secrets, and other such injunctive relief as is proper;

4. Award Labelbox punitive and exemplary damages in an amount to be determined at trial;

5. Award Labelbox their reasonable costs, including reasonable attorneys' fees;

6. Award Labelbox pre- and post-judgment interest as allowed by law; and

AMENDED COMPLAINT

7.    Award Labelbox all other equitable and legal relief the Court deems just and proper.

**PLAINTIFF RESPECTFULLY DEMANDS A JURY TRIAL.**

Dated: December 30, 2025                    Respectfully submitted,

/s/ *Corey Laplante*
STEPTOE LLP
COREY LAPLANTE (SBN: 294715)
One Market Plaza
Steuart Tower, 10th Floor, Suite 1070
San Francisco, CA 94105
claplante@steptoe.com
(213) 439-9400

STEPTOE LLP
MICHAEL ALLAN (*pro hac vice*)
1330 Connecticut Ave., NW
Washington, DC 20036
mallan@steptoe.com
(202) 429-3000

Attorneys for Plaintiff,
LABELBOX, INC.

AMENDED COMPLAINT