UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LABELBOX, INC.,

          Plaintiff,

    v.

KSHITIJ GUJARATI, V7 CO., V7 LTD., and ALBERTO RIZZOLI,

          Defendants.

Case No.  25-cv-10159-JSC

**ORDER RE: PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION AND OTHER MOTIONS**

Re: Dkt. Nos. 6, 15, 78, 79, 84, 86, 87, 89, 90, 91, 105, 107, 108, 111, 119, 120, 123, 124

**FINAL REDACTED VERSION**

Labelbox, Inc. ("Labelbox") sues V7 Co., V7 Ltd. ("V7"), and Alberto Rizzoli ("V7 Defendants"), as well as Kshitij Gujarati, for misappropriation of trade secrets and claims related to Mr. Gujarati's former employment at Labelbox and employment at V7.  (Dkt. No. 53.)[1]  Now pending before the Court is Labelbox's motion for a preliminary injunction against V7 Defendants.  (Dkt. No. 86).  Labelbox has also moved for leave to file out of time and for leave to file a motion for partial reconsideration, (Dkt. Nos. 87, 91), and V7 Defendants have requested an evidentiary hearing related to the preliminary injunction motion and moved for leave to file a surreply, (Dkt. Nos. 111, 124).

Having carefully considered the parties' submissions, and with the benefit of oral argument on March 5, 2026, the Court GRANTS Labelbox's motion for a preliminary injunction.  Labelbox has shown a likelihood of success on the merits of its Defend Trade Secrets Act claim, its

---

[1] Record citations are to material in the Electronic Case File ("ECF"); pinpoint citations are to the ECF-generated page numbers at the top of the document.

likelihood of suffering irreparable harm in the absence of an injunction, and that the balance of equities and public interest weigh in favor of an injunction.  The Court also GRANTS Labelbox's motions for leave to file out of time, and for leave to file a motion for partial reconsideration.  In addition, the Court DENIES V7 Defendants' request for an evidentiary hearing but GRANTS V7 Defendants' motion for leave to file a surreply.

<strong>BACKGROUND</strong>

**I.    RELEVANT FACTS**

   **A.    The AI Data Labeling Industry and the Parties**

Artificial intelligence ("AI") models "must be trained on massive amounts of data, such as images, text, video, audio, and geospatial files, to understand and generate human-like language, images, and video."  (Dkt. No. 11 ¶ 2.)  Because that data must be "aggregated, structured, and accurately labeled" before it can be used for training, "the need for high-quality, specialized training data has increased dramatically."  (*Id.* ¶¶ 2-3.)  "The data labeling industry is highly competitive, with numerous emerging players competing for market share" by "racing to develop proprietary annotation technologies" and "establish meaningful relationships with major AI labs and large customers to win and retain their business."  (*Id.* ¶ 7.)

   **1.    Labelbox**

Labelbox is a "data annotation and management platform [which] provides high quality data to the world's top [AI] laboratories developing machine learning ('ML') technology."  (*Id.* ¶ 2.)  Specifically, Labelbox "provid[es] customers with exceptional data through innovative software and [its] elite Alignerrs network," *i.e.*, "experts in a particular subject matter, who can annotate data related to complex topics and ideas."  (*Id.* ¶ 3.)  Labelbox's software includes "a comprehensive suite of tools and capabilities to train AI models, including techniques such as reinforcement learning with human feedback ('RLHF'), reinforcement learning from AI feedback ('RLAIF'), model evaluation, and adversarial testing ('red teaming')."  (*Id.*)  By "researching, developing, and refining its proprietary platform," which "includes software for processing data and evaluating data scoring metrics, system architecture and algorithms for aggregating datasets to improve data training models, millions of lines of curated data from AI training projects, and

United States District Court<br>Northern District of California

2

United States District Court
Northern District of California

training manuals and quality control metrics for Labelbox's network of Alignerrs," Labelbox "has achieved industry-leading data training quality and accuracy scoring benchmarks, which are highly confidential to Labelbox." (*Id.* ¶ 4.)

Labelbox "has also dedicated substantial time and resources []to . . . establishing customer relationships, including through highly sophisticated market research, contact information for customers, competitive pricing sheets and rate strategies for service offerings, pitch sheets, technical test data used in bids for work with customers, and marketing strategies including target industries and customers." (*Id.* ¶ 5.) "The work that Labelbox performs for these customers and the data that is generated through that work is proprietary to Labelbox." (*Id.* ¶ 6.) "Labelbox holds . . . aspects of its technical platform and business model in strict confidence and protects them as highly valuable trade secrets, which provide Labelbox with an advantage over its competitors." (*Id.* ¶ 7.) "Due to the substantive time, energy, and resources that Labelbox has invested in developing its technologies and processes, and in curating its customer lists, it would be immensely harmful should Labelbox's trade secrets become known to V7, a direct competitor," because it could cause "loss of existing and prospective customers and funding opportunities." (*Id.* ¶ 29.)

### 2.     V7

V7 "started as a data-labeling company focusing on labeling automation" but has grown into "a full-stack document automation company." (Dkt. No. 84-5 at 8.) V7 has two products in the market: "V7 Go and V7 Darwin." (*Id.*) V7 Go, launched in April 2024, is "a full-stack document automation product" for "technical team[s]" at enterprise customers to "automate workflows related to training LLMs" by leveraging existing AI. (*Id.* at 8-9; Dkt. No. 108-18 ¶ 5.) V7 Darwin is a software product for annotators to label data; specifically, it is "a workflow automation product focused on images and multimedia and generally video" and is used primarily for "AI research." (Dkt. No. 84-5 at 10.) At least V7 Darwin competes with Labelbox in the data labeling market. (Dkt. No. 84-6 at 39.) But both Go and Darwin involve human data labeling components. (Dkt. No. 84-5 at 10-11.) Between 2018 and 2025, V7 created Darwin and Go and developed relationships with AI labs including ████████████████. (Dkt. No. 108-21 at

14, 17.) Prior to its interactions with Mr. Gujarati, V7 had knowledge and experience in pricing, margins, and project proposals; data labeling and analysis for charts, tables and graphs; and creating QA pairs. (Dkt. No. 108-22 at 19-20; Dkt. No. 108-7 ¶¶ 3-4, 7; Dkt. No. 108-18 ¶¶ 3-4; Dkt. No. 108-6 ¶ 2; Dkt. No. 108-16 ¶¶ 3-5; Dkt. No. 108-15 ¶¶ 3-4; Dkt. No. 108-9 ¶ 3; Dkt. No. 109-116 ¶¶ 2-3; Dkt. No. 108-14 ¶ 3.)

### B. Mr. Gujarati's Work for Labelbox

Labelbox hired Mr. Gujarati as a Senior Product Manager in 2024. (Dkt. No. 11 ¶ 8.) When he began working at Labelbox, Mr. Gujarati signed a Proprietary Information and Inventions Agreement ("PIIA"), "which required him to 'hold in confidence and not disclose or, except within the scope of [his] employment, use any Proprietary Information.'" (*Id.*; Dkt. No. 14 (PIIA).) He also "completed training on information security while employed with Labelbox and certified his intent to comply with Labelbox's IT security policies." (Dkt. No. 12 ¶ 10.)

In March 2025, Labelbox promoted Mr. Gujarati to Head of Product and Director of Frontier AI, and he became one of Labelbox's "most senior employees" "responsible for overseeing Labelbox's industry-leading AI data-labeling operations and managing some of Labelbox's largest client accounts." (Dkt. No. 11 ¶¶ 8-9.) Because it was "necessary" to perform his work, Mr. Gujarati had "access to Labelbox's confidential, proprietary, and trade secret information," including "Labelbox's internal repositories, technical system specifications, data from projects, customer lists, customer contracts, prospective customer targets, pitch decks, industry metrics, pricing information and vendor lists." (*Id.* ¶ 9; Dkt. No. 12 ¶ 10.)

### C. V7's Recruitment and Hiring of Mr. Gujarati

In April 2025, V7 began searching for a General Manager for Darwin who had "existing relationships with AI labs, like ███████████████." (Dkt. No. 84-7 at 2.) V7 worked with a third-party recruiter to contact Mr. Gujarati, and V7 Co-Founder and CEO Mr. Rizzoli "shepherded" the interview process. (Dkt. No. 84-4 at 28-29.) The recruiter introduced Mr. Rizzoli and Mr. Gujarati over email on April 19, 2025; they spoke for the first time on May 2, 2025; and they met in person on May 30, 2025. (*Id.* at 29.)

The May 30, 2025 meeting "lasted approximately 90 minutes, with much of that time

4

discussing general industry topics." (Dkt. No. 84-3 ¶ 5.)  According to Mr. Gujarati, Mr. Rizzoli also "asked specific questions about how [Mr. Gujarati] helped build the human data labeling services business at Labelbox." (*Id.*)  In response, Mr. Gujarati "described how Labelbox was able to build its labeling services," "how and when [he] helped build Labelbox's team of forward-deployed engineers," "how Labelbox sequenced proof-of-concepts," and "when and how Labelbox expanded particular relationships." (*Id.* ¶ 6.)  "At Mr. Rizzoli's request, [Mr. Gujarati] shared lab-specific information that would enable V7 to pursue business with specific AI labs," which "included information regarding multiple AI labs' model development pain points, areas of focus, interest in data modalities and forward-looking research needs and interests." (*Id.* ¶ 7.)  Mr. Gujarati also shared Labelbox's "strategies for acquiring and vetting human expert labelers and sequencing labeling services projects to maximize client satisfaction and increase the likelihood of expanding the client relationship." (*Id.* ¶ 10.)  Although Mr. Rizzoli "expressed interest in client-specific project volume and revenue potential," Mr. Gujarati "declined to share the information at the time." (*Id.* ¶ 11.)  Mr. Rizzoli does not remember requesting Labelbox's confidential information from Mr. Gujarati during this interview, and "[w]hile [he] cannot speak to how Mr. Gujarati interpreted [his] questions, [he] never intended to solicit information that belonged to Mr. Gujarati's then-current employer." (Dkt. No. 108-18 ¶ 7.)

In June and July 2025, Mr. Gujarati met with other V7 employees, spoke again with Mr. Rizzoli, and met with two V7 investors.  (Dkt. Nos. 84-9, 84-10.)  Mr. Rizzoli had informed V7 employees Mr. Gujarati was "working for a direct competitor." (Dkt. No. 85-12 at 2.)  Nevertheless, during a July 24, 2025 meeting, Mr. Gujarati shared information about Labelbox's ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████████████████████████████ ███████████████████████████████ (Dkt. No. 79-7.)  "During these conversations, no one from V7 discouraged [Mr. Gujarati] from sharing information [he] learned while working at Labelbox." (Dkt. No. 84-3 ¶ 32.)

On July 30, 2025, V7 offered Mr. Gujarati a position "lead[ing] the Darwin business unit"

beginning on September 1, 2025.  (Dkt. No. 84-11 at 6-7; Dkt. No. 84-6 at 39.)  It was Mr. Gujarati's "general understanding that V7 hoped to generate revenue from human data labeling services as quickly as possible, and hired [him] because [he] possessed information about how [he] helped generate revenue from such services at Labelbox," which "would allow V7 to accelerate its entry and growth in the human data labeling services business."  (Dkt. No. 84-3 ¶ 3.)  V7 also planned for Mr. Gujarati to "work immediately on the V7 x ▉▉▉▉ labeling project."  (Dkt. No. 84-6 at 39; Dkt. No. 84-4 at 36.)

Mr. Gujarati accepted V7's job offer on August 2, and V7 believed he would leave Labelbox by mid-August.  (Dkt. No. 84-11 at 5; Dkt. No. 108-23 at 9.)  Instead, on August 15, 2025, Mr. Gujarati informed Labelbox he was leaving, and his last day at Labelbox was September 1, 2025.  (Dkt. No. 11 ¶ 10.)  Mr. Gujarati told Labelbox he was not going to a competitor and instead "was going to do contract work for a company in the electric vehicle component industry."  (*Id.* ¶ 10.)

### D.     Mr. Gujarati's Downloads from Labelbox

Meanwhile, beginning in June 2025, Mr. Gujarati began downloading and saving Labelbox documents to his personal computer, including:

> documents outlining Labelbox's core technology including system architecture, software architecture, underlying data from projects, key system benchmarking data, training and process flow data, as well as customer lists with confidential revenue information, customer contact information, pricing sheets, assessments of customer projects, customer agreements, pitch decks, target customers, and other strategic business and marketing plans.

(Dkt. No. 11 ¶ 14; Dkt. No. 79-8 (chart of downloaded documents).)  Many of the documents "were far outside the scope of Mr. Gujarati's work," and "include[d] confidential and trade secret documents."  (Dkt. No. 11 ¶ 14.)

According to Mr. Gujarati, Mr. Rizzoli's requests for information "were a significant factor in [his] choice to download information from Labelbox," and he "would not have engaged in such extensive downloading of Labelbox information absent the pressure [he] felt from Mr. Rizzoli to share information [he] learned while working at Labelbox."  (Dkt. No. 84-3 ¶ 38.)  In August 2025, V7 gave Mr. Gujarati, who was still employed at Labelbox, a V7 email account,

laptop, and Slack account; according to Mr. Rizzoli, V7 did so "a bit early so he [could] get his hands dirty with ████ and ████ projects." (Dkt. Nos. 84-16, 84-17, 85-11.) On several occasions, Mr. Gujarati accessed Labelbox documents, including a document containing all his daily notes from Labelbox, on web browsers on his V7-issued and personal laptops. (Dkt. Nos. 80-9, 83, 83-1.)

After Mr. Gujarati began working at V7, Mr. Rizzoli and V7's Head of Operations Anastasia Kaschenko "asked [him] to leverage specific customer contacts that [he] acquired while working at Labelbox and build strategies to win projects with those customers," which Mr. Gujarati "did not agree" to do. (Dkt. No. 84-3 ¶¶ 24-25; Dkt. Nos. 85-8, 85-9.) Mr. Rizzoli subsequently became "disappoint[ed]" in Mr. Gujarati, made staffing resources "less forthcoming," and began making "comments diminishing [his] contributions to [the ████ project V7 had won." (Dkt. No. 84-3 ¶ 27.) To Mr. Gujarati, this "felt correlated to [his] unwillingness to leverage the customer contacts that [he] acquired while working at Labelbox." (*Id*.) According to V7, however, Mr. Rizzoli, Ms. Kaschenko, and others had developed concerns about Mr. Gujarati's job performance. (Dkt. No. 108-18 ¶ 12; Dkt. No. 108-21 at 42-43; Dkt. No. 108-22 at 11-14; Dkt. No. 108-23 at 50, 52.)

### E.     Allegedly Misappropriated Trade Secrets

The parties describe several instances in which Mr. Gujarati shared Labelbox's asserted trade secrets with V7 Defendants.

#### 1.     Question & Answer ("QA") Pair Documents



On July 27, 2025, ████████████████████, contacted Mr. Rizzoli about a potential project to ████████████████████████ ████████████ (Dkt. No. 84-12.) Mr. Rizzoli and ████████ have known each other for about ten years and have a close personal relationship, and in June 2025, Mr. Rizzoli had described to ██████████████████████████████████████ which may have prompted ████████ July outreach. (Dkt. No. 108-21 at 73-75.) Following ████ outreach, Mr. Rizzoli and other V7 employees began working on the project proposal, including workflows, initial ████████████ (Dkt. Nos. 108-31, 108-32.) In a July 30, 2025 meeting

United States District Court
Northern District of California

with ▮▮▮▮▮▮▮▮ in V7's prior work.  (Dkt. No. 84-13.)  But the next day, Mr. Rizzoli and Mr. Gujarati discussed the possible ▮▮▮▮ project.  (Dkt. No. 85-20 at 6.)  Then, on August 3, Mr. Rizzoli sent ▮▮▮▮ ▮▮▮▮▮▮ details about how ▮▮▮▮▮▮.  (Dkt. No. 108-33.)  Mr. Rizzoli also began developing a pilot proposal for ▮▮▮▮ which he declares based pricing "on [his] experience working in the data labeling industry."  (Dkt. No. 108-18 ¶ 6.)

On August 4, 2025, Mr. Rizzoli asked Mr. Gujarati for his "opinion on pricing" in the ▮▮▮▮ statement of work.  (Dkt. No. 85-20 at 2; Dkt. No. 84-4 at 16-17.)  That day, Mr. Gujarati downloaded several Labelbox documents to his personal drives, including ▮▮▮▮ ▮▮▮▮ and ▮▮▮▮ (Dkt. No. 79-8; Dkt. No. 84-4 at 16-17.)  Mr. Gujarati then responded to Mr. Rizzoli detailing how he "typically" prices deals, including margins and prior pricing from ▮▮▮▮ he had worked on, and, "deriving from that," pricing for V7's project; his email attached the ▮▮▮▮ document.  (Dkt. No. 79-8; Dkt. No. 84-4 at 16-17; Dkt. No. 79-9.)  Mr. Rizzoli then shared Mr. Gujarati's email and attachment in a V7 Slack channel.  (Dkt. No. 79-10 at 2-3.)  In the following days, in response to V7's attempts to generate their own QA pairs, Mr. Rizzoli had noted ▮▮▮▮ ▮▮▮▮ and ▮▮▮▮ ▮▮▮▮ (Dkt. No. 79-11 at 6; Dkt. No. 84-14 at 2.)  However, V7's August 29, 2025 ▮▮▮▮ proposal did not include any information from Mr. Gujarati's August 4, 2025 document.  (Dkt. Nos. 108-69, 108-70.)

In addition, on September 10, 2025, after beginning work at V7, Mr. Gujarati also shared a document titled ▮▮▮▮ Samples" with V7 employees over Slack.  (Dkt. No. 84-18 at 8; Dkt. No. 84-4 at 17-18; Dkt. Nos. 79-12.)  The ▮▮▮▮ Samples" document was a modified version of a document "[External] ▮▮▮▮ – Samples v2" Mr. Gujarati had downloaded from Labelbox on August 4, 2025.  (Dkt. Nos. 79-8, 80.)  Although V7's Andrea Azzini and Mr. Rizzoli viewed the document, neither remembers the document's contents or using it.  (Dkt. No. 108-14 ¶ 4; Dkt. No. 108-18 ¶ 9.)

United States District Court
Northern District of California

On September 11, Mr. Gujarati created a new document eventually titled "EXTERNAL - ███████████ sample" which ███████████████████████████ ███████████ identical to those in Labelbox's ████████ - Samples" document. (Dkt. No. 85; Dkt. No. 84-4 at 18-20; Dkt. No. 85-1 at 4.)  Throughout September 2025, V7 employees revised the ██████████████████████ Samples" document and shared versions of its contents with multiple third parties, including ████████ (Dkt. No. 85-2 at 5; Dkt. No. 84-4 at 20; Dkt. Nos. 80-2, 85-3, 120-3, 120-9, 120-10, 120-11, 120-12.)  Separately, on September 19, V7's Umberto Di Fabrizio sent Mr. Gujarati a document containing 15 new sample charts and corresponding QA pairs, which Mr. Di Fabrizio created.  (Dkt. No. 108-82; Dkt. No. 85-4; Dkt. No. 108-9 ¶ 7.)  Mr. Gujarati incorporated Mr. Di Fabrizio's work into a new version of the proposal and sent it to ████████  (Dkt. No. 85-4; Dkt. No. 108-85.)

On September 25, 2025, Mr. Gujarati signed V7's first deal with ████████ to provide QA pairs generated by human expert labelers for ████████████████████.  (Dkt. No. 85-5.)  Mr. Gujarati subsequently closed a second ████████ QA pairs deal with ████████  (Dkt. No. 85-14; Dkt. No. 84-5 at 14.)  Both ████████ contracts involved tasks for several hundred thousand dollars with planned phase two tasks projected to be in the tens of millions of dollars upon successful completion of phase one.  (Dkt. No. 84-5 at 16-17.)  V7 denies Mr. Gujarati "won the ████████ account."  (Dkt. No. 108-21 at 192.)

V7 employees attest they knew about and had independently generated ████████ QA pairs and related work product before Mr. Gujarati shared any information.  (Dkt. No. 108-9 ¶ 5; Dkt. No. 108-13 ¶¶ 4-5; Dkt. No. 108-22 at 29; Dkt. No. 108-21 at 24.)  Furthermore, "the [] concept of a Q/A pair or chain-of-thought are words that are available on the internet," and therefore public knowledge.  (Dkt. No. 107-4 at 14.)  "But the methodology to use them in a specific context . . . is not."  (Id.)  So, according to Ms. Kaschenko, V7's "belief was that [Mr. Gujarati] had written" the QA pairs himself without Labelbox's information.  (Dkt. No. 108-23 at 25.)

**2.    Rate Card and Pricing Information**

On August 13, 2025, before Mr. Gujarati began his employment with V7, and while he

was still employed with Labelbox, Mr. Rizzoli emailed Mr. Gujarati's personal email for his "thoughts on [an] RFP from ████████████." (Dkt. No. 84-15 at 4-5.) The next day, Mr. Gujarati responded he would send "global tiered rates that [V7] can use for reference" in order to "price aggressively." (*Id.* at 4.) Mr. Gujarati then downloaded a Labelbox file "External ████████████████████" to his personal Google drive. (Dkt. No. 79-8.) And on August 15, Mr. Rizzoli emailed Mr. Gujarati: "Thanks for the scan. Joe ([from] our people team) will send you access to a V7 email where we can continue the convo :)." (Dkt. No. 84-15 at 4.) In addition, on August 21, Mr. Gujarati, from his new V7 email, sent V7 employee Vignesh Kamlimuthu a "reference for rates" document, as "[s]omething I have created and shared with AI Labs customers previously." (*Id.* at 2.)

Ms. Kaschenko declares V7 "did not utilize any of the information Mr. Gujarati shared" and "V7's understanding is that the rate card that was shared was a generic document that had rates . . . that are very familiar to the business and are easily accessible with some searching on public sites." (Dkt. No. 108-5 ¶ 3; Dkt. No. 108-23 at 45.) Furthermore, "V7 [had] periodically used third-party contractors as data labelers" and had experience on rates to charge. (Dkt. No. 108-18 ¶ 3.)

### 3. Audio RL Project File Document

In a V7 call about the ████████ work on September 11, 2025, Mr. Gujarati screenshared one page of a document titled ████████████████████████████ which, according to Labelbox, includes Labelbox work on ████████████. (Dkt. No. 85-17 at 16; Dkt. No. 84-4 at 23; Dkt. No. 108-38 at 30.) According to V7 employees in the meeting, the document "was irrelevant to any work V7 did for ████████ and Mr. Gujarati's sharing of it was "unprompted" and "no[t] relevant." (Dkt. No. 108-9 ¶ 9; Dkt. No. 108-23 at 41.) In part, this is because "V7 does not label ████████████"; instead, "Darwin ████████████████████████." (Dkt. No. 108-18 ¶ 11; Dkt. No. 108-21 at 58.) There is also some publicly available information on ████████ data labeling. (Dkt. Nos. 109-85, 109-86, 109-87, 109-88, 109-98.)

### 4. Natural Language Document

On November 10, 2025, Mr. Gujarati created a modified version of a Labelbox document

United States District Court
Northern District of California

titled "███████████████████ Samples," which includes an overview, ███████ ███████████████████████. (Dkt. No. 107-10; Dkt. No. 80-7.)  Mr. Gujarati shared the document with V7 employees on November 10 and November 12 as a "███████ [document] from [his] previous work"; he explained it was a "███████████████████ Samples.docx" document, "created while at Labelbox . . . so he could more easily articulate the interesting work he had done in the past."  (Dkt. No. 84-4 at 22-23; Dkt. No. 85-15.)  Ms. Kaschenko does not remember viewing the document or its contents.  (Dkt. No. 108-5 ¶ 5.)  Furthermore, V7 had existing knowledge of prompt generation, and the concept is also publicly known.  (Dkt. No. 108-6 ¶ 2, Dkt. No. 108-18 ¶ 4.)

### F.    Labelbox's Discovery and the Present Litigation

In mid-October, Labelbox discovered via LinkedIn Mr. Gujarati had joined V7.  (Dkt. No. 11 ¶ 11.)  Labelbox sent a letter to Mr. Gujarati "reminding him of his obligation to protect Labelbox's proprietary information" and asking him "to acknowledge" those obligations; he provided a "short response by email" on October 16, 2025.  (*Id*.)  Labelbox sent a similar letter to V7 to "inform them of Mr. Gujarati's continuing obligation to protect Labelbox's confidential, proprietary and trade secret information," and requesting confirmation he had not disclosed or used such information.  (*Id.* ¶ 12; Dkt. No. 10-4 at 2.)  Several V7 employees received the letter, but no one responded.  (Dkt. No. 85-10 at 2-3; Dkt. No. 85-16 at 7-8.)  After receiving notice of this litigation, Mr. Rizzoli called Mr. Gujarati and raised concerns he "had a tendency to talk a lot."  (Dkt. No. 84-5 at 25.)

The parties' neutral forensic investigator imaged Mr. Gujarati's repositories at V7, and V7 Defendants' own vendor preserved and removed documents with particular titles from V7's Google Workspace and Slack.  (Dkt. No. 107-15 ¶¶ 4-12; Dkt. No. 119-3 at 19.)  The V7 employees who saw any part of these documents state they do not remember what they saw.  (Dkt. No. 108-5 ¶¶ 3-6; Dkt. No. 108-7 ¶¶ 5, 8, 10; Dkt. No. 108-15 ¶¶ 5-6; Dkt. No. 108-11 ¶ 5; Dkt. No. 108-9 ¶ 10; Dkt. No. 108-16 ¶ 10; Dkt. No. 108-14 ¶¶ 4-5; Dkt. No. 108-12 ¶ 3; Dkt. No. 108-19 ¶¶ 8-11; Dkt. No. 108-6 ¶¶ 4-6; Dkt. No. 106-13 ¶ 6; Dkt. No. 108-8 ¶ 4; Dkt. No. 109-116 ¶ 4; Dkt. No. 108-10 ¶ 3.)  Mr. Gujarati has been suspended since early December 2025, and V7 sent

11

him notice of his termination in February 2026.  (Dkt. No. 108-5 ¶ 7.)

Labelbox has not identified any customers who told Labelbox they would reduce or stop business with Labelbox for reasons related to Mr. Gujarati or V7.  (Dkt. No. 107-4 at 31-32.) Although Labelbox's business with ███████████████████████████████████████████, Labelbox cannot attribute the slowdown to V7.  (*Id.* at 33-36, 109-110.)  And, Labelbox has signed multiple contracts with █████████████████████.  (*Id.* at 113-120.)

## II.    PROCEDURAL HISTORY

On November 24, 2025, Labelbox sued (1) Mr. Gujarati and V7 for trade secret misappropriation under the Defend Trade Secrets Act ("DTSA"), 18 U.S.C. §§ 1836, 1839; and (2) Mr. Gujarati for breach of contract.  (Dkt. No. 1.)  The same day, Labelbox moved for an ex parte temporary restraining order, an order to show cause regarding a preliminary injunction, and expedited discovery.  (Dkt. No. 6.)  The Court granted in part Labelbox's request for a temporary restraining order and set a status conference with Defendants about the remaining requested relief. (Dkt. No. 21.)  Specifically, the Court ordered:

> Defendants, their agents, employees, partners, and any others acting in concert with them or on their behalf, are hereby enjoined from:
>
> a. using, disclosing, copying or disseminating in any way any of Labelbox's confidential, proprietary, and trade secret information, and any business, technical, financial, or other non-public Labelbox information, including but not limited to any documents and data concerning, referring, or related to information Gujarati accessed and/or downloaded from Labelbox prior to or after his departure from Labelbox (henceforth, "Labelbox Information"); using, disclosing, copying or disseminating any documents, information or material that concerns, refers or relates to, directly or indirectly, any of Labelbox's Information; or using, disclosing, copying or disseminating any material that derives from in whole or in part any of Labelbox's Information;
>
> b. destroying, deleting, changing, altering, or otherwise eliminating any version (whether hard copy, native, or electronic) of any documents or electronically stored information on any device or in any account (whether in printed form or downloaded to any remote storage system, computer, hard drive, server, disk drive, flash drive, cellular telephone, CD, DVD, USB drive, or any other device that can be used to electronically store data or information) relating to Labelbox's Information, including any data, files, information, forensic remnants, metadata, or digital artifacts

United States District Court
Northern District of California

stored on or within the device;

c. controlling, logging into, or otherwise accessing (other than as required by 2(d) below) any electronic devices (e.g., cellular devices, computers), online storage repositories (e.g., Gmail, Google Drive, iCloud), or other electronic storage devices containing any of Labelbox's Information that are currently accessible by Defendants or in Defendants' possession, custody, or control;

d. disposing of, deleting, changing, altering, wiping, tampering with, or destroying any remote storage systems (including cloud storage accounts), computers, hard drives, servers, disk drives, flash drives, cellular telephones, CDs, DVDs, USB drives, and any other devices that have been used by Gujarati since June 1, 2024, and any data, files, information, forensic remnants, metadata, or digital artifacts stored on or within the device; e. violating, aiding, or participating in the violation of any terms of the PIIA, as detailed in the Complaint.

(*Id.* at 1-2.)  At the status conference, Mr. Gujarati agreed to cooperate in a neutral forensic evaluation and respond to the expedited discovery requests.  (Dkt. No. 27.)  Because V7 represented it had placed Mr. Gujarati on leave and would cooperate with Labelbox to ensure none of Labelbox's material was in V7's possession, the Court did not order V7 to comply with the expedited discovery requests.  (*Id.*)  The Court subsequently set a briefing schedule for Labelbox's motion for a preliminary injunction.  (Dkt. No. 46.)

Labelbox then filed an amended complaint adding Mr. Rizzoli as a defendant and asserting claims: (1) against all Defendants for trade secret misappropriation under the DTSA; (2) against Mr. Gujarati for breach of contract; (3) against V7 and Mr. Rizzoli for tortious interference with a contract; (4) against V7 and Mr. Rizzoli for tortious interference with prospective business advantage; (5) against V7 and Mr. Rizzoli under California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200; (6) against Mr. Gujarati for breach of the duty of loyalty; (7) against V7 and Mr. Rizzoli for aiding and abetting Mr. Gujarati's breach of the duty of loyalty; (8) against all Defendants for conversion; and (9) against all Defendants for civil conspiracy.  (Dkt. No. 53.)

The Court has granted Labelbox's and Mr. Gujarati's stipulations to stay proceedings between them until April 27, 2026 given ongoing settlement negotiations.  (Dkt. Nos. 72, 117.)  In addition, V7 Defendants moved to dismiss the state law claims against them, and the Court granted their motion with leave to amend.  (Dkt. Nos. 75, 122.)

Now pending before the Court are Labelbox's motions for a preliminary injunction and for leave to file exhibits out of time.  (Dkt. Nos. 86, 87.)  Labelbox also moved for leave to file a motion for partial reconsideration of the Court's earlier discovery ruling.  (Dkt. No. 91.)  And V7 Defendants request an evidentiary hearing in connection with Labelbox's motion for a preliminary injunction motion and move for leave to file a surreply to the preliminary injunction motion.  (Dkt. Nos. 111, 124.)

**DISCUSSION**

## I.    MOTION FOR PRELIMINARY INJUNCTION

To obtain a preliminary injunction, a plaintiff must establish: "[1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008) (citations omitted); *see also King v. Saddleback Jr. Coll. Dist.*, 425 F.2d 426, 428 n.2 (9th Cir. 1970) (explaining a likelihood of success on the merits means a "reasonable probability" of success).  "A preliminary injunction may also be appropriate if a movant raises 'serious questions going to the merits' and the 'balance of hardships . . . tips sharply towards' it, as long as the second and third *Winter* factors are satisfied."  *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (citation omitted).  Ultimately, however, "[a] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."  *Apartment Ass'n of Los Angeles Cnty., Inc. v. City of Los Angeles*, 10 F.4th 905, 911 (9th Cir. 2021) (cleaned up).

### A.    Likelihood of Success on the Merits[2]

"To succeed on a claim for misappropriation of trade secrets under the DTSA, a plaintiff must prove: (1) that the plaintiff possessed a trade secret, (2) that the defendant misappropriated the trade secret; and (3) that the misappropriation caused or threatened damage to the plaintiff."

---

[2] The Court evaluates only Labelbox's likelihood of success on its DTSA claim, as Labelbox's motion does not address its state law claims, and the Court has dismissed them for failure to state a claim.  (Dkt. No. 122.)

United States District Court
Northern District of California

*InteliClear, LLC v. ETC Glob. Holdings, Inc.*, 978 F.3d 653, 657-58 (9th Cir. 2020) (citing 18 U.S.C. § 1839(5)).

### 1. Labelbox's Trade Secrets

The DTSA defines a "trade secret" as:

> all forms and types of financial, business, scientific, technical, economic, or engineering information, including patterns, plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs, or codes, whether tangible or intangible, and whether or how stored, compiled, or memorialized physically, electronically, graphically, photographically, or in writing if—
> (A) the owner thereof has taken reasonable measures to keep such information secret; and
> (B) the information derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure of use of the information.

18 U.S.C. § 1839(3).  "Therefore, the definition of trade secret consists of three elements: (1) information, (2) that is valuable because it is unknown to others, and (3) that the owner has attempted to keep secret." *InteliClear, LLC*, 978 F.3d at 657 (citing 18 U.S.C. §§ 1839(3), (5)). "[T]he definition of what may be considered a 'trade secret' is broad." *Id.* (citation omitted). However, "[t]he plaintiff should describe the subject matter of the trade secret with *sufficient particularity* to separate it from matters of general knowledge in the trade or of special knowledge of those persons . . . skilled in the trade." *Id.* at 658 (quotation marks and citation omitted).

### a. Labelbox's Information and Its Value

Although Labelbox initially relied on its records of files Mr. Gujarati downloaded before leaving Labelbox to describe the trade secret information at issue, it has revised and narrowed its contentions as expedited discovery has proceeded.  On January 20, 2026 and February 4, 2026, based on V7's admission "it improperly acquired at least seven Labelbox documents," Labelbox "identifi[ed] [its] trade secret information contained within Labelbox versions of those documents."  (Dkt. No. 79-6 at 7-8.)  Labelbox describes several types of technical data labelling information in these documents.  First, the ▮▮▮▮▮▮▮▮▮▮ document and Mr. Gujarati's daily notes include information on Labelbox's "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15

██████████████████████████████████████," including "step-by-step instructions for ███████████████████████████████████████████████████████████ ████████." (*Id.* at 8-9, 12-13.) Second, the QA Pair documents include Labelbox's "question and answer chain-of-thought (CoT) prompts for ████████████████████████████████ ██████████████████ including ██████████████████████████ and accompanying data. (*Id.* at 10-11, 13-14.) Third, information in the ████████████████████ covers Labelbox's "process, method, prompts, and data for developing data for ██████████████████████████ ██████████████████████," including ████████████████████████████████ (*Id.* at 9, 11-13.)

As to its economic value, this technical information is "strictly confidential to Labelbox," was "developed by ████████████████████████████████████████████████████████ ████████████████████████████████████ (*Id.* at 9.) *See WeRide Corp. v. Kun Huang*, 379 F. Supp. 3d 834, 847 (N.D. Cal. Apr. 1, 2019) (finding information has value because "[t]he investment and development make the source code confidential and proprietary to [the plaintiff], giving it an advantage over competitors"). The QA pair and CoT reasoning data sets, in particular, "represent some of the most valuable data in the AI ecosystem broadly, and . . . some of the most valuable data that Labelbox possesses," given "how AI labs utilize this data to improve their models as well as the prices [Labelbox] ha[s] observed major labs are willing to pay for this data." (Dkt. No. 79-4 ¶ 2.) So, Labelbox can likely prove it has technical information which derives independent economic value from being unknown.

Labelbox also identifies business information related to Labelbox's rate card, pricing strategy and margins, and customer project proposals, which it has generated through its "algorithms, formulas, margins, and know-how" and "██████████████████████████ ██████████████████ (Dkt. No. 79-6 at 10, 12-13.) Labelbox marked this information as confidential, entered into non-disclosure agreements with customers, and restricted access to this information within Labelbox because the "detailed information about the work Labelbox was performing for the key customer, as well as the pricing and rate structures for that work, [] is not generally known in the industry." (Dkt. No. 11 ¶ 23.) Furthermore, "[i]n the hands of V7, this

information could devastate Labelbox's business by providing V7 with an exact list of customers to approach, information about how to undercut Labelbox's pricing, and Labelbox's strategy for working with clients moving forward." (*Id.* ¶ 24.)

The rate cards, project proposals, and pricing models therefore have "potential economic value because [they] allow[] a competitor like [V7] to direct its sales efforts to those potential customers that are already using the [plaintiff's] system." *See MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d 511, 521 (9th Cir. 1993) (holding customer database "that allows [the plaintiff] to tailor its service contracts and pricing to the unique needs of its customers [] constitutes a trade secret"); *see also Henry Schein, Inc. v. Cook*, 191 F. Supp. 3d 1072, 1077 (N.D. Cal. 2016) ("Customer information such as sales history and customer needs and preferences constitute trade secrets." (citation omitted)). So, Labelbox has identified business information which derives economic value from being unknown.

V7 Defendants argue V7 "already knew about and had its own information regarding the concepts [Labelbox] points to: Q&A pairs, prompt generation, CoT descriptions, rate cards, pricing strategy and margins, and the like," including because "there is considerable public domain information in all the areas in dispute." (Dkt. No. 107-3 at 29.) It is true "information in the public domain or that is generally known never qualifies as a trade secrets." *Genentech, Inc. v. JHL Biotech, Inc.*, No. 18-CV-06582-WHA, 2019 WL 1045911, at *16 (N.D. Cal. Mar. 5, 2019) (citing *Shapiro v. Hasbro, Inc.*, 653 F. App'x 568, 568-69 (9th Cir. 2016)). However, that some of the information in each of the documents may be public knowledge or previously known to V7 does not mean the documents do not also include Labelbox's trade secrets. *See WeRide Corp.*, 379 F. Supp. 3d at 847 (rejecting the defendants' argument because "several articles [] describe the general functionality [the plaintiff] references to its alleged trade secrets[,] . . . the alleged trade secrets are readily available in the public" because the plaintiff "is not claiming that the functionalities of its code are trade secret, but that the source code itself comprises its trade secrets"); *see also Genentech, Inc.*, 2019 WL 1045911, at *16 (holding although "some of the information . . . within the trove of documents at issue may be publicly disclosed," "there is a likelihood that [] compilations [of that information] do in fact constitute trade secrets"). For

United States District Court
Northern District of California

example, that the concepts of QA pairs or CoT reasoning traces are publicly known does not mean Labelbox's *particular* QA pairs and CoT traces are public.  Similarly, that V7 Defendants had prior knowledge or access to public information on data labeler rates does not mean it knew *Labelbox's* rates and pricing margins.  So, V7 Defendants' argument is unavailing.

V7 Defendants also argue Labelbox has not described its trade secret information with sufficient particularity to show it constitutes a trade secret.  *See Inteliclear, LLC*, 978 F.3d at 658.  However, V7 Defendants rely on cases in which courts found the plaintiffs' allegations of "broad categories" of business or technical information insufficiently particular to create a likelihood they included trade secrets.  *See uSens, Inc. v. Shi*, No. 18-CV-01959-SVK, 2018 WL 11436323, at *2 (N.D. Cal. Oct. 11, 2018) (considering allegations of "various business topics" and "sensitive product technology" too broad); *see also Digital Mentor, Inc. v. Ovivo USA, LLC*, No. 17-CV-1935-RAJ, 2018 WL 993944, at *2 (W.D. Wash. Feb. 21, 2018) (considering alleged "processes, technology, and system" information insufficient to show a likelihood of trade secrets).  In contrast, Labelbox has described likely trade secret information within each of the documents V7 Defendants received.

So, Labelbox has identified with sufficient particularity business and technical information which derives independent economic value from being unknown.

### b.    Labelbox's Attempts to Keep Secret

Courts have considered the combination of employee "confidentiality agreements" and "internal security measures" sufficient to show "reasonable efforts to preserve [information's] secrecy."  *See Postdata Co. v. Kim*, No. C-07-02504 RMW, 2007 WL 1848661, at *5 (N.D. Cal. June 27, 2007); *see also TMX Funding, Inc. v. Impero Techs., Inc.*, No. C 10-00202 JF (PVT), 2010 WL 1028254, at *4 (N.D. Cal. Mar. 18, 2010) (considering employee confidentiality agreements and password protections sufficient).  Labelbox declares it takes "extensive measures both internally and externally" to maintain its information's confidentiality, including:



(Dkt. No. 12 ¶ 5.)  And, "[t]o the best of Labelbox's knowledge," each of the identified documents was "created by ███████████ (Dkt. No. 79-6 at 16-18.)  So, Labelbox is likely to succeed in showing it has taken "reasonable measures to keep such information secret."  *See* 18 U.S.C. § 1839(3)(A).

### 2.    V7 Defendants' Misappropriation

As to the second element, "misappropriation" under the DTSA includes:

> (A) acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> (B) disclosure or use of a trade secret of another without express or implied consent by a person who—
>> (i) used improper means to acquire knowledge of the trade secret;
>> (ii) at the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret was—
>>> (I) derived from or through a person who had used improper means to acquire the trade secret; [or]
>>> (II) acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secret or limit the use of the trade secret . . .

18 U.S.C. § 1839(5).  "Improper means [] includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means; and [] does not include reverse engineering, independent derivation, or any other lawful means of acquisition."  *Id.* § 1839(6).

Labelbox has shown a likelihood of success in proving V7 Defendants at least acquired Labelbox's trade secrets with knowledge or reason to know their acquisition involved Mr. Gujarati's breaching a duty to maintain secrecy.  *See* 18 U.S.C. § 1839(5)(A).  V7 Defendants do

United States District Court
Northern District of California

not dispute Mr. Gujarati shared documents containing Labelbox's asserted trade secrets with V7 employees, including Mr. Rizzoli, and therefore that V7 Defendants at some point acquired those documents. Labelbox also presents compelling evidence V7 Defendants knew or should have known Mr. Gujarati was breaching his duties of confidentiality to Labelbox. First, in May 2025, Mr. Rizzoli requested from Mr. Gujarati "lab-specific information that would enable V7 to pursue business with specific AI labs," and "client-specific project volume and revenue potential." (Dkt. No. 84-3 ¶¶ 7, 11.) Then, in August 2025, Mr. Rizzoli asked Mr. Gujarati for his opinions on a V7 statement of work and an RFP, and Mr. Gujarati sent the QA Pair document, reference "global tiered rates," and information on how he typically prices deals, including an example prior deal with █████████ (Dkt. No. 84-4 at 15-17; Dkt. No. 84-15.) Because Mr. Rizzoli knew Mr. Gujarati was working for Labelbox at that time, it is likely he knew—or at least, had reason to know—Mr. Gujarati was improperly sharing Labelbox documents or information. *See Waymo LLC v. Uber Techs., Inc.*, No. C 17-00939 WHA, 2017 WL 2123560, at *7 (N.D. Cal. May 15, 2017) ("Waymo has supplied a compelling record that [the employee defendant] pilfered over 14,000 files from Waymo, and that Uber knew or should have known as much when it brought him on board.").

Furthermore, Labelbox's October 2025 letter gave V7 reason to know Mr. Gujarati owed duties of confidentiality to Labelbox. So, when Mr. Gujarati later shared the █████████████ Document as a "████████████ [document] from [his] previous work," V7 likely had reason to know Mr. Gujarati was breaching his duty to protect Labelbox's confidential information. (Dkt. No. 84-4 at 22-23; Dkt. No. 85-15.) Given Mr. Gujarati's repeated comments he was sharing documents from his previous work, V7 Defendants' argument they believed all the information acquired from Mr. Gujarati was based on public knowledge, rather than Labelbox's trade secret information, is not persuasive. Furthermore, V7 Defendants' statements they never requested Labelbox's trade secret information is irrelevant to whether they acquired such information through what they knew or should have known were improper means, especially given V7 Defendants conceded at oral argument they never asked Mr. Gujarati to stop sending Labelbox information. So, Labelbox can likely prove V7 Defendants misappropriated its trade secrets because they knew or should have known they were acquiring them through improper means.

20

United States District Court
Northern District of California

The parties more vigorously debate whether V7 Defendants have disclosed or used Labelbox's trade secrets. *See* 18 U.S.C. § 1839(5). But V7 Defendants do not dispute V7 employees viewed and downloaded the "███████████ – Samples" document Mr. Gujarati shared. (Dkt. No. 79-12; Dkt. No. 120-4 at 20-21.) And V7 Defendants also admitted at oral argument a QA pair from this samples document, which originated from a Labelbox document, was included in a document shared with ███████ (Dkt. No. 120-19 at 20-21.) Furthermore, in September 2025, a V7 employee sent Labelbox's QA pair to at least three other companies to provide guidance on the data labeling work. (Dkt. Nos. 120-9, 120-10, 120-11, 120-12.) So, although V7 Defendants attest they do not remember Mr. Gujarati's documents, (Dkt. No. 108-14 ¶ 4; Dkt. No. 108-18 ¶ 9), and had independently generated other ██████████ QA pairs before Mr. Gujarati shared Labelbox's information, (Dkt. No. 108-9 ¶ 5; Dkt. No. 108-13 ¶¶ 4-5), the evidence at least presents "serious questions" regarding whether V7 Defendants have disclosed or used Labelbox's trade secrets. *See Disney Enters., Inc.*, 869 F.3d at 856.

So, Labelbox is likely to succeed in proving V7 Defendants misappropriated their trade secrets at least by acquiring them from Mr. Gujarati. And furthermore, there remain serious questions whether V7 Defendants misappropriated Labelbox's alleged trade secrets by disclosing or using them.

### 3.    Damage to Labelbox

Labelbox also can likely show "the misappropriation caused or threatened damage to" it. *See InteliClear, LLC*, 978 F.3d at 657-58. Even if Labelbox cannot prove V7 already used or disclosed its trade secret information, V7's mere acquisition of information Labelbox has devoted significant investments to developing diminishes the value of that information. *See Henry Schein, Inc.*, 191 F. Supp. 3d at 1077 (finding harm through loss of "economic value of [the plaintiff's] accumulated data on current and prospective customers"). V7's acquisition also poses a threat V7 will use or disclose that information in the future. For example, with knowledge of Labelbox's rate cards and pricing models, V7 would have an advantage in competing with Labelbox for customers, and make it more likely Labelbox might lose business. *See id.* (finding harms in risk of losing "established customer relationships").

So, Labelbox has shown a likelihood of success on the merits of its DTSA claim.

### B.    Irreparable Harm

A plaintiff must also show "he is likely to suffer irreparable harm in the absence of preliminary relief." *Winter*, 555 U.S. at 20; *see also id.* at 21 ("[P]laintiffs must demonstrate a likelihood of irreparable injury—not just a possibility—in order to obtain preliminary relief."). "An irreparable harm is one that cannot be redressed by a legal or equitable remedy following trial." *Optinrealbig.com, LLC v. Ironport Sys., Inc.*, 323 F. Supp. 2d 1037, 1050 (N.D. Cal. 2004) (citing *Pub. Util. Comm'n v. FERC*, 814 F.2d 560, 562 (9th Cir. 1987)).

"An injunction in a trade secret case seeks to protect the secrecy of misappropriated information and to eliminate any unfair head start the defendant may have gained." *Lamb-Weston, Inc. v. McCain Foods, Ltd.*, 941 F.2d 970, 974 (9th Cir. 1991) (citation omitted).  In evaluating Labelbox's preliminary injunction motion, the Court will not presume irreparable harm. *See Cutera, Inc. v. Lutronic Aesthetics, Inc.*, 444 F. Supp. 3d 1198, 1208 (E.D. Cal. 2020).  However, "[i]t is well established that the loss of market position and the disclosure of trade secrets can constitute irreparable harm." *WeRide Corp.*, 379 F. Supp. 3d at 853-54 (citations omitted).

Labelbox has shown V7's continued access to Labelbox's trade secret information likely gives it an unfair and irreparable competitive advantage over Labelbox.  Labelbox and V7 are competitors in a "highly competitive" industry in which many companies are "racing . . . to establish meaningful relationships with major AI labs and large customers to win and retain their business."  (Dkt. No. 11 ¶ 7.)  With the trade secrets Labelbox describes, a competitor "can win business from a lab by impressing them with their initial failure rate," "acquire an immediate competitive advantage," or "devastate Labelbox's business by providing V7 with an exact list of customers to approach, information about how to undercut Labelbox's pricing, and Labelbox's strategy for working with clients moving forward."  (*Id.* ¶ 24; Dkt. No. 79-4 ¶¶ 4-5.)  So, an injunction is necessary to prevent Labelbox's "market position [becoming] set back as" its competitor "receive[s] an unfair boost." *WeRide Corp.*, 379 F. Supp. 3d at 853 (citing *Lamb-Weston, Inc.*, 941 F.2d at 974) (noting a competitor's access to trade secrets can cause particularly irreparable harm in a "nascent" industry "crowded with competitors").

22

In addition, in the absence of an injunction, Labelbox's confidential and trade secret information will likely disseminate further among V7 employees and third parties, which would constitute irreparable harm. *See WeRide Corp.*, 379 F. Supp. 3d at 853 (holding "disclosure of the trade secrets among [the defendants] increases the risk of their broader disclosure," which constitutes irreparable harm because "[a] trade secret once lost is, of course, lost forever" (quotation marks and citation omitted)); *Genentech, Inc.*, 2019 WL 1045911, at *19 (finding "risk of further disclosure of [] trade secrets to third parties . . . irreparable"). V7 Defendants contend there is no risk of future dissemination because their own vendor removed documents with particular names from V7's Google Workspace and Slack. (Dkt. No. 107-15 ¶¶ 4-11.) However, given the limits of this search and evidence V7 employees incorporated Labelbox's QA pair into other documents and sent it to multiple third parties, V7 Defendants' assertion fails to persuade. (Dkt. Nos. 120-9, 120-10, 120-11, 120-12.)

V7 Defendants also broadly contend there is no risk of irreparable harm because "V7 no longer has access to these documents, the employees who briefly saw them do not remember them, and [Labelbox] failed to identify any active, ongoing use of an alleged trade secret." (Dkt. No. 107-3 at 24.) *See United States v. Oregon State Med. Soc'y*, 343 U.S. 326, 333 (1952) ("The sole function of an action for injunction is to forestall future violations."). But it is not enough for V7 to claim it no longer has access to Labelbox's documents when it may have already used or incorporated information from those documents and could continue to do so in the future. *See East West Bank v. Shanker*, No. 20-CV-07364-WHO, 2021 WL 3112452, at *14 (N.D. Cal. July 22, 2021) ("Defendants' return of EWB's documents does not alleviate the harm that would be caused by Defendants' continued use of EWB's information."). V7 employees' declarations they do not remember particular contents of the documents Mr. Gujarati shared are also insufficient in light of Labelbox's discovery of such information in V7's documents. (Dkt. No. 121-1 ¶¶ 17-19; Dkt. Nos. 120-16, 120-17, 120-18.) Finally, V7 Defendants' argument Labelbox has not identified any "active, ongoing use of an alleged trade secret" is not persuasive because V7 is currently subject to a temporary restraining order prohibiting such use, which Labelbox seeks to extend to a preliminary injunction.

23

This case is therefore unlike the cases V7 Defendants rely on, in which there was undisputed evidence the defendants no longer had access to or use for any of the plaintiff's trade secret information.  *See, e.g.*, *JTH Tax, LLC v. Agnant*, 62 F.4th 658, 672 (2d Cir. 2023) (affirming district court's finding an insufficient showing of irreparable harm when the defendant "was no longer using [the plaintiff's] name, confidential information, or proprietary information and resources"); *New Jersey Deer Control, LLC v. EN Garde Deer Def. LLC*, No. CV 24-5587 (MAS) (RLS), 2024 WL 2818277, at \*5 (D.N.J. June 3, 2024) (finding no irreparable harm when the plaintiff had no evidence the defendants were using its trade secrets); *Gecko Robotics, Inc. v. Summit NDE, LLC*, No. 2:23-CV-229-PPS-JEM, 2024 WL 1344773, at \*5 (N.D. Ind. Mar. 29, 2024) (finding no irreparable harm because all documents had been returned); *Elgin Separation Sols., LLC v. Dillon*, No. 2:23-CV-00440, 2023 WL 6796201, at \*6 (S.D.W. Va. Oct. 13, 2023) (finding no irreparable harm when the defendant "made assurances that it has readily searched for, identified, and returned all Elgin drawings in its possession and has since only used readily available OEM drawings or drawings reverse engineered by Ritchie").  Furthermore, in several of these cases, the courts emphasized the trade secret information was not useful to the defendant. *See, e.g.*, *Cambell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-93 (3d Cir. 1962) (noting the defendant was no longer attempting to make a product related to the trade secret information); *Perrin Bernard Supowitz, LLC v. Morales*, No. 23-55189, 2024 WL 411714, at \*2 (9th Cir. Feb. 5, 2024) (noting any asserted trade secrets were "old and stale"); *Crumbl LLC v. Dirty Dough LLC*, No. 2:22-CV-318-HCN-CMR, 2023 WL 5180370, at \*8-9 (D. Utah Aug. 11, 2023) (finding substantial evidence the plaintiff's information was not useful to the defendant).

In addition, because Labelbox and V7 continue to compete for work with ███████ an important potential customer to both companies, the parties extensively debate whether Labelbox has shown it is likely to suffer the loss of ███████ as a customer.  However, V7 admits it at least sent one of Labelbox's QA pairs to ███████  Furthermore, V7's hiring of Labelbox's senior employee to lead their ███████ relationship and that employee's likely sharing of Labelbox's trade secrets with V7 makes it reasonably likely V7 could use those trade secrets to undermine Labelbox's relationship with ███████ in the future.  *See Henry Schein, Inc.*, 191 F. Supp. 3d at

24

United States District Court
Northern District of California

1077 (finding irreparable harm because "Plaintiff has shown there is a likelihood that it will lose established customer relationships," especially when "Plaintiff has alleged that [Defendant] has already misappropriated [its] customer information and sought to solicit and divert customers"); *see also Citibank, N.A. v. Mitchell*, No. 24-CV-08224-CRB, 2024 WL 4906076, at *5 (N.D. Cal. Nov. 26, 2024) (finding irreparable harm given "evidence that [the defendant] contacted one of [the plaintiff's] clients").

V7 Defendants contend Labelbox cannot show a risk of irreparable harm to its relationship with ▇▇▇▇ absent evidence Labelbox's relationship with ▇▇▇▇ has already suffered because of V7 Defendants' use of the trade secrets. *See, e.g.*, *Greenmount LLC v. Cleanline Mgmt. LLC*, No. 2:23-CV-10376-MRA-RAO, 2024 WL 5505735, at *16 (C.D. Cal. Sept. 18, 2024) (finding no irreparable harm because the plaintiff had no evidence of loss of sales or market position, or loss of customers or earnings); *JMS Mfg., LLC v. DePonceau*, No. CV 25-14, 2025 WL 509353, at *6 (W.D. Pa. Feb. 14, 2025) (finding because the plaintiff retained the customers' business, there was "insufficient evidence demonstrating an imminent threat of loss of goodwill, business relationships, or reputation"). But the Court is not persuaded Labelbox must present evidence it has already suffered irreparable harm to its relationship with ▇▇▇▇ especially given the parties' ongoing direct competition and the value of the information at issue. *See WeRide Corp.*, 379 F. Supp. at 853 (finding irreparable harm because the plaintiff "is likely to have its market position set back as [the defendants] receive an unfair boost"); *cf. Abrasic 90 Inc. v. Weldcote Metals, Inc.*, 364 F. Supp. 3d 888, 903-04 (N.D. Ill. 2019) (finding no irreparable harm when the information "is likely of minimal marginal value of to the defendants" and there was no evidence the trade secret information "contributed to" customer relationships). Regardless, Labelbox need not show the risk of irreparable harm to its relationship with ▇▇▇▇ specifically, because it has shown a likely risk of irreparable harm through V7's unfair competitive advantage and further dissemination of its trade secret information.

Ultimately, Labelbox presents evidence Mr. Gujarati downloaded significant confidential—and likely trade secret—information from Labelbox and shared at least some of it with V7 Defendants. Given such evidence, "it is far better to instead put in prophylactic measures

25

United States District Court
Northern District of California

now to prevent misappropriation (or further misappropriation)" rather than engaging in the "bone-crushing endeavor" of having to identify and enjoin parts of V7's technology, business, and operations after trial in the absence of preliminary injunctive relief.  *See Waymo, LLC*, 2017 WL 2123560, at \*11; *see also Genentech, Inc.*, 2019 WL 1045911, at \*20 (finding disclosure "virtually untraceable" if allowed to proceed).

So, Labelbox has shown it is likely to suffer irreparable harm absent a preliminary injunction.

### C.    Balance of Equities

To determine whether the balance of equities weighs in favor of an injunction, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24 (quotation marks and citation omitted).  For the reasons explained above, Labelbox is likely to suffer irreparable harm absent an injunction.  And an injunction preventing V7 Defendants from using or disclosing Labelbox's trade secrets places no burden on them beyond "what the law already requires."  *WeRide Corp.*, 379 F. Supp. 3d at 854.  V7 Defendants contend Labelbox's proposed injunction would prejudice them because they "would have to guess what information is or is not covered, at risk of a contempt motion," and Labelbox "could challenge V7 for using information that turned out to be V7's own, independently-developed information, or that turned out to be publicly-available."  (Dkt. No. 107-3 at 31.)  However, the Court "can address this concern by narrowly tailoring the injunctive relief to be granted."  *See WeRide Corp.*, 379 F. Supp. 3d at 854 (citing *Sierra Forest Legacy v. Rey*, 577 F.3d 1015, 1022 (9th Cir. 2009)).  And V7 Defendants can oppose any hypothetical, unjustified contempt motion with evidence they independently derived the information at issue based on publicly available information, rather than Labelbox's trade secrets.

So, the balance of equities weighs heavily in Labelbox's favor.

### D.    Public Interest

"[T]he public has a strong interest in protecting intellectual property rights" and in "promot[ing] fair and lawful competition in an emerging market."  *WeRide Corp.*, 379 F. Supp. 3d

26

at 854 (citing *Waymo LLC*, 2017 WL 2123560, at *11-12). Because Labelbox "has shown at least serious issues going to the merits of its misappropriation claims," "the public has an interest in vindicating" Labelbox's "rights in valid trade secrets warranting protection until trial." *See Waymo LLC*, 2017 WL 2123560, at *11. V7 Defendants contend public interests cannot favor vague trade secret injunctions because overbroad injunctions can thwart lawful competition, but, as explained above, the Court "can address this concern by narrowly tailoring the injunctive relief to be granted." *See WeRide Corp.*, 379 F. Supp. 3d at 854 (citing *Sierra Forest Legacy*, 577 F.3d at 1022). So, the public interest weighs in favor of an injunction.

* * *

So, Labelbox has shown it is likely to succeed on the merits of its DTSA claim, it is likely to suffer irreparable harm absent preliminary relief, the balance of equities weights in its favor, and an injunction is in the public interest. Labelbox is therefore entitled to a preliminary injunction narrowly tailored to prevent irreparable harm.

### E.    Scope of the Injunction

"Injunctive relief . . . must be tailored to remedy the *specific harm alleged*" and cannot be overbroad. *See Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Tr.*, 636 F.3d 1150, 1160 (9th Cir. 2011) (citation omitted). The Ninth Circuit has therefore vacated injunctions which prohibit conduct "in which [the defendants] have a right to engage," including using "generally known" information or employees' "general skill, knowledge, and experience, even though acquired in part during their [prior] employment." *Winston Rsch. Corp. v. Minnesota Min. & Mfg. Co.*, 350 F.2d 134, 143-44 (9th Cir. 1965); *see also MAI Sys. Corp. v. Peak Computer, Inc.*, 991 F.2d at 522-23 (vacating injunction because the plaintiff did not "specifically identify these trade secrets" beyond stating the "diagnostic software 'contain[s] valuable trade secrets'").

Ultimately, "[a] district court has broad discretion to fashion injunctive relief." *Armstrong v. Newsom*, 58 F.4th 1283, 1292 (9th Cir. 2023) (quotation marks and citation omitted). However, under Federal Rule of Civil Procedure 65(d), a court's preliminary injunction order must "state its terms specifically" and "describe in reasonable detail—and not by referring to the complaint or other document—the act or acts restrained or required." Fed. R. Civ. P. 65(d)(1).

27

Labelbox moves for a preliminary injunction enjoining V7 Defendants from:

> 1. Using, copying, accessing, or disclosing Labelbox's Confidential information including the Labelbox Trade Secrets referenced herein;
> 2. Destroying, deleting, or concealing evidence;
> 3. Disposing of or otherwise tampering with any storage systems containing [documents] used by Defendant Kshitij Gujarati ("Gujarati") since May 1, 2025;
> 4. Violating or aiding and abetting in the violation of any terms of Defendant Gujarati's Proprietary Information and Inventions Agreement with Labelbox.

(Dkt. No. 78-3 at 5.)  V7 Defendants argue Labelbox's proposed injunction includes a "vague and muddled description of its asserted trade secrets [which] does not permit the Court to accurately parse (1) V7's independently developed skills and knowledge; (2) public information; and (3) the blurry and catch-all wording [Labelbox] uses to identify the alleged trade secrets."  (Dkt. No. 107-3 at 27.)  Given the similarity between Labelbox's proposed preliminary injunction and the Court's temporary restraining order, and the absence of disputes regarding the meaning of the temporary restraining order since its November 25, 2025 entry, the Court is not persuaded Labelbox's proposed language is unclear.  *See also Nat'l Registry of Emergency Med. Technicians v. Shimek*, No. 24-CV-05524-RFL, 2024 WL 5700869, at *2 (N.D. Cal. Oct. 15, 2024) (prohibiting the defendant from using the plaintiff's "confidential information and trade secrets").

Nevertheless, Labelbox's reply brief proposes new language more narrowly tailored to the information it has shown is likely to contain trade secrets and the documents V7 Defendants accessed.  (Dkt. No. 121-25.)  Specifically, Labelbox defines "Labelbox's Confidential Information" as the "trade secret information defined and described in Labelbox's Interrogatory No. 1 response," "reflected in [11] Labelbox documents" V7 acquired, and summarized in Labelbox's motion for a preliminary injunction.  (*Id.* at 3-4.)  For the reasons explained above, Labelbox has demonstrated these documents likely contain its trade secrets and would pose irreparable harm to Labelbox if further accessed, used, or disseminated by V7 Defendants.

In light of Labelbox's identification of a limited set of documents containing asserted and further described trade secret information, V7 Defendants' continued objections as to the vagueness of the preliminary injunction are unavailing.  In none of the cases V7 Defendants cite did the court issue an injunction as specific as Labelbox's proposal.  *See Winston Rsch. Corp.*, 350

28

F.2d at 143-44 (considering overbroad an injunction prohibiting "knowledge of the reasons for the particular specifications of the [plaintiff's] machine, and knowledge of what not to do . . . and how not to make the same mistakes as [the plaintiff]" (cleaned up)); *MAI Sys. Corp.*, 991 F.2d at 522-23 (holding prohibition as to "diagnostic software contain[ing] valuable trade secrets" was not specific enough); *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 385 (3d Cir. 2021) (holding prohibition as to "pricing information, strategies, and market information" insufficiently specific (cleaned up)); *Patriot Homes, Inc. v. Forest River Hous., Inc.*, 512 F.3d 412, 415 (7th Cir. 2008) (vacating injunction for the plaintiff's "'playbook' for constructing modular homes consisting of its blueprints, engineering calculations, quality control manuals, and other documents"); *Am. Can Co. v. Mansukhani*, 742 F.2d 314, 326 (7th Cir. 1984) (vacating injunction when a prior case had already narrowed the plaintiff's trade secrets beyond the scope of the injunction).

So, the preliminary injunction order Labelbox proposes in its reply brief is tailored to remedy the specific present and future harms Labelbox asserts, states its terms specifically, and describes in reasonable detail the restrained acts.

## II.    MOTION FOR LEAVE TO FILE OUT OF TIME

Under Federal Rule of Civil Procedure 6(b), the court may, "for good cause," extend a deadline "on motion made after the time has expired if the party failed to act because of excusable neglect." Fed. R. Civ. P. 6(b). "In determining whether the parties have shown excusable neglect," courts consider four factors: "(1) the danger of prejudice to the nonmoving parties, (2) the length of delay, (3) the reason for the delay, and (4) whether the movant acted in good faith." *Linder v. Bridge*, No. 14-CV-03861-SC, 2015 WL 1778608, at *2 (N.D. Cal. Apr. 17, 2015) (citing *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 385 (1993); *Silber v. Mabon*, 18 F.3d 1449, 1455 (9th Cir. 1994)).

Labelbox's motion for a preliminary injunction was due February 5, 2026. (Dkt. No. 63.) Although Labelbox timely filed its motion under seal, it did not file the exhibits or the unsealed motion until the morning of February 6, 2026. So, Labelbox moves for leave to file out of time. (Dkt. No. 87.) Labelbox states there is no danger of prejudice to opposing parties because the case has been stayed as to Mr. Gujarati, and Labelbox continuously exchanged materials with V7

29

Defendants.  Labelbox has explained its delay, which lasted less than a day, resulted from issues uploading the large number of exhibits to ECF and ensuring their accuracy.  Furthermore, Labelbox states it has acted in good faith to diligently file documents and communicate with V7 Defendants.  So, as Labelbox has shown excusable neglect, and Defendants do not oppose the motion, the Court grants Labelbox's motion for leave to file out of time.

### III.    MOTION FOR LEAVE TO FILE A MOTION FOR PARTIAL RECONSIDERATION

Under the Civil Local Rules, a party may seek leave to move for reconsideration of an interlocutory order any time before the entry of final judgment.  *See* N.D. Cal. Civ. L.R. 7-9(a). Leave is appropriate when the moving party shows "reasonable diligence in bringing the motion and one of the following":

> (1) That at the time of the motion for leave, a material difference in fact or law exists from that which was presented to the Court before entry of the interlocutory order for which reconsideration is sought. The party also must show that in the exercise of reasonable diligence the party applying for reconsideration did not know such fact or law at the time of the interlocutory order; or
> (2) The emergence of new material facts or a change of law occurring after the time of such order; or
> (3) A manifest failure by the Court to consider material facts or dispositive legal arguments which were presented to the Court before such interlocutory order.

*Id.* at 7-9(b).  "Whether to grant leave to file under Rule 7-9 is committed to the Court's sound discretion."  *HDMI Licensing Adm'r, Inc. v. Availink Inc.*, No. 22-CV-06947-EKL, 2026 WL 177857, at *1 (N.D. Cal. Jan. 20, 2026).

During expedited discovery, V7 Defendants filed a discovery dispute letter regarding Labelbox's objection to their RFP No. 18, which sought "documents referring to or reflecting any Labelbox plans to compete with V7 Co.'s product 'Go.'"  (Dkt. No. 69 at 3.)  On January 26, 2026, Labelbox explained it objected to RFP No. 18 as irrelevant because "[t]he fact that V7 has a second business which may not compete with Labelbox [*i.e.*, Go] is not relevant to the harm Labelbox will suffer if V7 is permitted to use Labelbox's trade secrets for its other business [*i.e.*, Darwin]," and "V7 admits [Go] does not compete with Labelbox."  (Dkt. No. 71 at 3.)  So, on February 4, 2026, the Court held:

> Plaintiff concedes it is not claiming irreparable injury based on competition from V7's Go product. Plaintiff also represents its business does not compete with V7's Go product. So, the Court understands Plaintiff to be representing that it has no documents that show plans to compete with Go. Plaintiff shall be held to this representation. And in light of this representation, the motion to compel is denied.

(Dkt. No. 77 at 1-2.)

On February 11, 2026, Labelbox sought "reconsideration of the portion of the Court's order holding that Labelbox represents that its business does not compete with V7 Go and that Labelbox will be held to such representation." (Dkt. No. 89-3 at 7.) Labelbox contends in his January 27, 2026 deposition, V7's Simon Edwardsson testified there was ▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (Dkt. No. 90-5 at 10-11.) For example, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ (*Id.* at 12.) According to Labelbox, these new facts pose a risk of irreparable harm through V7 "using [] trade secrets as part of work authorized under a Statement of Work for V7 Go." (Dkt. No. 89-3 at 6.)

V7 Defendants oppose Labelbox's motion because Labelbox learned such facts on January 27, 2026, before "the time of the interlocutory order." *See* N.D. Cal. Civ. L.R. 7-9(b). However, in light of the expedited timeline for discovery, Labelbox's newly discovered evidence, and Labelbox's diligence in seeking leave for reconsideration after the Court's order, the Court in its discretion grants Labelbox's motion. Labelbox may file a motion for reconsideration by March 26, 2026. But before it does so, it must meet and confer with V7 Defendants regarding a stipulation and discuss how Labelbox's revised position affects its prior refusal to answer V7 Defendants' RFP No. 18.

## IV.    ADMINISTRATIVE MOTION FOR EVIDENTIARY HEARING

"While an evidentiary hearing is not required before a district court rules on a preliminary injunction, 'if the disputed [] facts are simple and little time would be required for an evidentiary hearing, proceeding on affidavits alone might be inappropriate.'" *Pok v. ZBS L., LLP*, No. 2:25-CV-01084-DJC-CSK, 2025 WL 1455324, at *3 (E.D. Cal. May 21, 2025) (quoting *Int'l Molders' & Allied Workers' Local Union, No. 164 v. Nelson*, 799 F.2d 547, 555 (9th Cir. 1986)).

31

V7 Defendants request an evidentiary hearing to "offer[] limited testimony" from Mr. Rizzoli before the Court rules on the motion for a preliminary injunction. (Dkt. No. 111 at 2.) According to V7 Defendants, Labelbox's arguments regarding Mr. Rizzoli's conduct and intentions are "baseless," and "Mr. Rizzoli is prepared to refute them live, in Court[,] . . . so that the Court may make a credibility determination regarding directly conflicting accounts of Mr. Rizzoli's motives and conduct." (*Id.* at 2-3.) Labelbox opposes V7 Defendants' request in light of Mr. Rizzoli's deposition and two declarations but requests, in the alternative, "(1) the testimony not be limited to V7's proposed topics or witnesses and (2) the Court provide guidance to the Parties on the time allotted for the hearing so that the parties may make plans for witness testimony, evidence presentation and argument." (Dkt. No. 114 at 3.)

In light of the extensive discovery before the Court, including from Mr. Rizzoli, the Court denies V7 Defendants' request for an evidentiary hearing. Further, for purposes of this motion, the Court accepted Mr. Rizzoli's testimony he did not intend to solicit Labelbox's documents; that testimony does not create a dispute as to V7's receipt and sharing of Labelbox's information.

## V.    SEALING MOTIONS

Also pending before the Court are 12 motions to seal documents attached to various filings. (Dkt. Nos. 15, 78, 79, 84, 89, 90, 105, 107, 108, 119, 120, 123.) Having reviewed the parties' submissions and declarations, the Court DENIES both parties' sealing requests without prejudice.

There is a right of public access to judicial records and documents. *See Nixon v. Warner Commc'ns, Inc.*, 435 U.S. 589, 597 (1978). In considering motions to seal, "a strong presumption in favor of access is the starting point." *Kamakana v. City & Cnty. Of Honolulu*, 447 F.3d 1172, 1178 (9th Cir. 2006) (cleaned up). So, parties seeking to seal judicial records relating to motions "more than tangentially related to the underlying cause of action," *Ctr. for Auto Safety v. Chrysler Grp.*, 809 F.3d 1092, 1099 (9th Cir. 2016), bear the burden of overcoming the presumption of access with "compelling reasons supported by specific factual findings . . . that outweigh the general history of access and the public policies favoring disclosure," *Kamakana*, 447 F.3d at 1178-79 (cleaned up). However, records attached to "nondispositive motions" which are "not

United States District Court
Northern District of California

related, or only tangentially related, to the merits of a case," are not subject to the strong presumption of access and must instead meet a lower "good cause" standard. *See Ctr. for Auto Safety*, 809 F.3d at 1098-99.

In addition, under Civil Local Rule 79-5, sealing is only permitted when the parties have established "the applicable legal standard and the reasons for keeping a document under seal, including an explanation of: (i) the legitimate private or public interests that warrant sealing; (ii) the injury that will result if sealing is denied; and (iii) why a less restrictive alternative to sealing is not sufficient." *See* N.D. Cal. Civ. L.R. 79-5(c)(1). Civil Local Rule 79-5 also requires the parties to "narrowly tailor[]" their requests only to the sealable material. *Id.* at 79-5(c)(3). Thus, although sometimes it may be appropriate to seal a document in its entirety, whenever possible a party must redact. *See Kamakana*, 447 F.3d at 1183 (noting a preference for redactions so long as they "have the virtue of being limited and clear").

As an initial matter, contrary to Labelbox's assertion the good cause standard applies, (Dkt. No. 78 at 2), a motion for a preliminary injunction may be subject to the compelling reasons standard. *See Ctr. for Auto Safety*, 809 F.3d at 1100-02 (applying compelling reasons standard to motion for a preliminary injunction because the plaintiffs' complaint sought similar injunctive relief). Furthermore, rather than explain compelling reasons for sealing each document, both parties describe broad categories of purported harms if groups of documents are unsealed. (*E.g.*, Dkt. No. 78 at 3-4 (seeking to seal filings which "pertain directly to documents and information over which Plaintiff is claiming trade secret protection" or other "confidential business information"); Dkt. No. 108 at 4 (seeking to seal filings which contain V7's "proprietary information," "confidential contracts and negotiations," and "other confidential operational and business information").) In addition, the parties generally seek to seal exhibits in their entirety rather than "narrowly tailor[ing]" their requests with redactions. *See* N.D. Cal. Civ. L.R. 79-5(c)(3); *see also Kamakana*, 447 F.3d at 1183 (noting a preference for redactions). So, although the briefs and exhibits likely include some sealable information, the parties' current approach does not meet their sealing burden.

The Court therefore denies all the sealing requests without prejudice. Each party shall file

33

renewed sealing requests as a single omnibus motion which clearly identifies the documents subject to the motion, proposed redactions, the reason for sealing particular contents of each document with citation to supporting evidence, and the docket number of the original sealing motion. The omnibus motion should also include proposed redactions, if any, to this Order. The parties' renewed sealing motions shall be filed by **March 24, 2026**.

### CONCLUSION

For the reasons stated above, the Court GRANTS Labelbox's motion for a preliminary injunction, (Dkt. No. 86), and ORDERS V7, Mr. Rizzoli, and all persons acting under, in concert with, or for any one of them, whether or not in the United States, enjoined from the following:

1) Any and all use, disclosure, providing third parties access to, transferring, copying, duplication, reproduction, publication, distribution, broadcasting or marketing of any version or iteration of Labelbox's Confidential Information, as defined herein, including the use of any version or iteration of Labelbox's Confidential Information in connection with any of V7 Defendants' ongoing or future client projects.

Any and all use, disclosure, copying or distribution of any documents, information or materials that concern or refer to any of Labelbox's Confidential Information.

Any and all use, disclosure, copying or distribution of any material that derives from in whole or in part any of Labelbox's Confidential Information.

Labelbox's Confidential Information shall mean the trade secret information described and defined in Labelbox's Interrogatory No. 1 response (Dkt. No. 79-6 at 6-15), reflected in Labelbox documents (Dkt. Nos. 80, 80-3, 80-4, 80-6, 80-7, 80-8, 80-9, 81, 81-1, 82, 82-1), and further summarized in Labelbox's Motion for Preliminary Injunction (Dkt. No. 79-3 at 14) as:

> (1) Labelbox's processes, instruction manuals, prompts, and data for improving AI system analysis of ████████████████████

34

including Q&A pairs, CoT reasoning prompts, metrics to use when developing those pairs and prompts, and numerous specific examples of data for ███ in specific scenarios;

(2) Labelbox's rate card, project proposals, and pricing strategy and models for specific tasks and for human data labeling services as charged to clients based on specific metrics, including specific to major AI lab projects for analyzing███████████, as well as Labelbox's ██████ ██████████████████████████;

(3) Labelbox's process, methods, prompts, and data for training and calibrating AI systems to analyze ███████████ ███████████████████████ ██████; and

(4) Labelbox's process, methods, prompts, and data for developing data for ███████████████, including████████ ████████████████████████████ ██████████████.

2) Destroying, deleting, changing, altering, or otherwise eliminating any version (whether hard copy, native, or electronic) of any documents or electronically stored information on any device or in any account (whether in printed form or downloaded to any remote storage system, computer, hard drive, server, disk drive, flash drive, cellular telephone, CD, DVD, USB drive, or any other device that can be used to electronically store data or information) relating to Labelbox's Confidential Information, including any data, files, information, forensic remnants, metadata, or digital artifacts stored on or within the device;

3) Disposing of, deleting, changing, altering, wiping, tampering with, or destroying any remote storage systems (including cloud storage accounts), computers, hard

35

drives, servers, disk drives, flash drives, cellular telephones, CDs, DVDs, USB drives, and any other devices that have been used by Kshitij Gujarati since May 1, 2025, and any data, files, information, forensic remnants, metadata, or digital artifacts stored on or within the device; and

4) Violating, aiding, or participating in the violation of any terms of Kshitij Gujarati's Proprietary Information and Inventions Agreement with Labelbox.

The Court also GRANTS Labelbox's motion for leave to file out of time, (Dkt. No. 87), GRANTS Labelbox's motion for leave to file a motion for reconsideration, (Dkt. No. 91), DENIES V7 Defendants' motion for an evidentiary hearing, (Dkt. No. 111), and GRANTS V7 Defendants' motion for leave to file a surreply, (Dkt. No. 124).

The Court will hold an initial case management conference on April 29, 2026 at 2:00 p.m. via Zoom video. The parties shall submit a joint case management conference statement by April 22, 2026.

This Order disposes of Docket Nos. 6, 15, 78, 79, 84, 86, 87, 89, 90, 91, 105, 107, 108, 111, 119, 120, 123, 124.

**IT IS SO ORDERED.**

Dated: March 12, 2026

JACQUELINE SCOTT CORLEY
United States District Judge

United States District Court
Northern District of California

36